# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| JORGE OSWALDO AQUINO MARTINEZ, ELVIS NAHUM CRUZ VASQUEZ, HEBER ALFONSO ZAPATA CONTRERAS, ISIDRO ARELLANO CHIHUAHUA, JOSE MARIA RAMIREZ MORALES, LUIS ADRIAN SALAZAR LOZANO, VERONICA OLAN CASTILLO, and AARON HERNAN PEREZ SALAZAR, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| | Civil Action No. 3:22-cv-00145-TCB-RGV |
| v. | |
| MOBIS ALABAMA, LLC d/b/a HYUNDAI MOBIS; KIA GEORGIA, INC.; GB2G, INC. d/b/a ALLSWELL; SPJ CONNECT, INC.; YOUNGJIN LEE, individually; JOB KNOWLEDGE, LLC; and TOTAL EMPLOYEE SOLUTION SUPPORT, LLC, | Second Amended Complaint Class Action  JURY DEMAND |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT

# <u>TABLE OF CONTENTS</u>

Nature of the Case ........................................................................... 1

The Parties ..................................................................................... 5

Joint Employment Allegations ......................................................... 12

    The Hyundai Claimants ............................................................. 12

    The Kia Claimants .................................................................... 13

Jurisdiction and Venue .................................................................... 14

Exhaustion of Administrative Remedies ........................................... 15

Statement of Facts .......................................................................... 16

    The TN Visa Program ............................................................... 16

    Defendants' Fraudulent Scheme ................................................ 19

        SPJ and Allswell ................................................................ 19

        TESS and JKL .................................................................... 23

    Plaintiffs' Statement of Facts .................................................... 25

        Plaintiff Jorge Oswaldo Aquino Martinez ........................... 25

        Plaintiff Elvis Nahum Cruz Vasquez ................................. 30

        Plaintiff Heber Alfonso Zapata Contreras ........................... 43

        Plaintiff Jose Maria Ramirez Morales ................................ 51

        Plaintiff Luis Adrian Salazar Lozano ................................. 60

ii

Plaintiff Isidro Arellano Chihuahua ................................................. 70

Plaintiff Veronica Olan Castillo ........................................................ 82

Plaintiff Aaron Hernan Perez Salazar ............................................. 90

Employment Discrimination ........................................................ 97

RICO VIOLATIONS ..................................................................... 99

RICO Enterprises ......................................................................... 99

Enterprise I ............................................................................. 100

Association-in-Fact ................................................. 100

Participation in the Operation and Management of
the Enterprise's Affairs ............................................... 105

Pattern of Continuous Coordinated Conduct ............. 107

Racketeering Activity through Numerous Predicate
Acts of Fraud ............................................................... 109

Plaintiffs' Pecuniary Injuries Directly and Proximately
Caused by the Pattern of Racketeering Activity ........ 111

Enterprise II ............................................................................ 112

Association-in-Fact ................................................. 113

Participation in the Operation and Management of
the Enterprise's Affairs ............................................... 117

Pattern of Continuous Coordinated Conduct ............. 118

Racketeering Activity through Numerous Predicate
Acts of Fraud ............................................................... 120

Plaintiffs' Pecuniary Injuries Directly and Proximately
Caused by the Pattern of Racketeering Activity ........ 123

Enterprise III ........................................................................ 124

Association-in-Fact ..................................................... 124

Participation in the Operation and Management of the
Enterprise's Affairs ..................................................... 129

Pattern of Continuous Coordinated Conduct ............. 131

Racketeering Activity through Numerous Predicate
Acts of Fraud ............................................................... 133

Plaintiffs' Pecuniary Injuries Directly and Proximately
Caused by the Pattern of Racketeering Activity ........ 135

The RICO Conspiracy ............................................................ 137

Class Action Allegations .................................................................... 139

Numerosity ........................................................................... 141

Existence and Predominance of Common Questions .................. 141

Typicality ............................................................................. 143

Adequacy ............................................................................. 145

Superiority ........................................................................... 146

FLSA Collective Action Allegations ................................................ 147

COUNT I: Federal RICO Claim ........................................................ 151

Predicate Acts ...................................................................... 153

iv

Mail and Wire Fraud 18 U.S.C. §§ 1341 and 1343 ......................... 153

Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351 ................. 153

Fraud and Misuse of Visas: 18 U.S.C. § 1351 ................................. 154

Pattern of Related Racketeering Acts ........................................... 155

Conspiracy ..................................................................................... 156

Injury and Remedies ..................................................................... 156

COUNT II: Georgia RICO Claim .................................................... 157

Predicate Acts: .............................................................................. 159

Conduct Defined as "Racketeering" ............................................. 159

False Statements and Writings in violation of
O.C.G.A. § 16-10-20 ...................................................................... 159

Pattern of Related Racketeering Acts ........................................... 160

Injury and Remedies ..................................................................... 163

COUNT III: Title VII Claim ............................................................ 164

COUNT IV: Violation of 42 U.S.C. § 1981 ..................................... 166

COUNT V: FLSA Collective Action Claim ..................................... 168

COUNT VI: Breach of Contract Claim ........................................... 170

COUNT VII: Filing False Information Returns Claim ..................... 171

Prayer for Relief ............................................................................ 172

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jorge Oswaldo Aquino Martinez ("Plaintiff Aquino"), Elvis Nahum Cruz Vasquez ("Plaintiff Cruz"), Heber Alfonso Zapata Contreras ("Plaintiff Zapata"), Isidro Arellano Chihuahua ("Plaintiff Arellano"), Jose Maria Ramirez Morales ("Plaintiff Ramirez"),  Luis Adrian Salazar Lozano ("Plaintiff Salazar"), Veronica Olan Castillo ("Plaintiff Olan"), and Aaron Hernan Perez Salazar ("Plaintiff Perez") (collectively referred to as "Plaintiffs"), file this Second Amended Class Action Complaint for damages and equitable relief against Mobis Alabama, LLC d/b/a Hyundai Mobis ("Hyundai"), Kia Georgia, Inc. ("Kia"), GB2G, Inc. d/b/a Allswell ("Allswell"), SPJ Connect, Inc. ("SPJ"), Youngjin Lee ("Defendant Lee"), Job Knowledge, LLC ("JKL"), and Total Employee Solution Support, LLC ("TESS"), (collectively referred to as "Defendants"), individually and on behalf of other similarly situated employees of Defendants.

## NATURE OF THE CASE[1]

1.     This case involves fraud, discrimination, and wage violations against foreign workers who were exploited as part of an illegal scheme for cheap labor in Hyundai's and Kia's automotive production plant in West Point, Georgia (the "Hyundai/Kia plant"). Hyundai and Kia share common ownership, and each had automotive operations at the Hyundai/Kia plant.

2.     Hyundai and Kia associated with the recruitment and staffing agency Defendants—Allswell, SPJ, JKL, and TESS—for the common purpose of recruiting Plaintiffs and other foreign professionals to secure nonimmigrant "Trade NAFTA" or "TN" visas for them to work as laborers on Hyundai's and Kia's production lines.

3.     All Defendants knew that TN visas would not and could not be granted for manual labor positions such as the production line laborer positions that Hyundai and Kia wanted filled. This was because TN visas are available only to professional-level foreign workers to work in professional-level, technical job positions.

---

[1] This case is complicated—eight Plaintiffs bring seven counts against some or all of seven Defendants with interwoven business relationships. Exhibit 28 makes these relationships and counts clear in three charts. The **Plaintiff Chart** shows which Defendants paid each Plaintiff and which Defendants' production lines the Plaintiffs worked on in the Hyundai/Kia plant. The **RICO Enterprise Chart** shows the Defendants' full names, complaint identifiers, and statuses as members and conspirators in RICO Enterprises I, II, and III. Finally, the **Claims Chart** shows which Plaintiffs bring which claims against which Defendants.

4. Defendants therefore hatched a scheme to recruit highly skilled Mexican engineers and technicians for non-existent professional-level positions that would qualify for the TN visa program.

5. The plan was a bait and switch accomplished by fraud against the foreign workers and the U.S. government: hire the professional-level Mexican engineers and technicians for non-existent engineer and technician jobs; assist these engineers and technicians with securing the TN visas by submitting fraudulent documents to the U.S. government; and when the foreign workers arrive to the United States, switch the job to a manual labor job with lower and discriminatory pay and excessive mandatory work hours.

6. Plaintiffs and other Mexican engineers and technicians were victims of this scheme, having relied upon the fraudulent misrepresentations of Defendants to pay money for fraudulent visas, spend money to travel to the U.S. Consulate for interviews, and move from Mexico to the U.S. for jobs they reasonably believed qualified for the TN visa program and would utilize their specialized education, experience, and skill.

7. Defendants' conduct violated the federal and Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO") statutes.

8. Defendants Hyundai, Kia, Allswell, and JKL's discriminatory conduct

also constituted race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").

9.     As further detailed below, once some of the Plaintiffs began working at the assembly facility operated by Defendants Hyundai and Kia in West Point, Georgia ("the Hyundai/Kia plant"), Defendant Lee told them he had law enforcement contacts, threatening them and others with deportation if they tried to transfer their TN visa to another employer. Defendant Lee also frequently entered the employee housing without permission and routinely berated them.

10.     Defendant Allswell also filed false information returns with the U.S. Internal Revenue Service ("IRS"), willfully underreporting some of the Plaintiffs' and other TN visa holders' taxable wages, in violation of 26 U.S.C. § 7434.

11.     Defendants Hyundai, Kia, Allswell, Lee, and JKL also failed to pay minimum wages and overtime wages based on the regular rate of pay, in violation of the Fair Labor Standards Act ("FLSA").

12.     Plaintiffs, on behalf of the Recruitment Class (as defined below), seek compensatory and trebled damages, as well as attorneys' fees and costs, for Defendants' violations of the federal RICO and Georgia RICO, and punitive damages under the Georgia RICO.

13.     Plaintiffs also seek on behalf of the Recruitment Class (as defined below), consequential, incidental, and/or nominal damages, and attorneys' fees and costs for contract breaches by Defendants Hyundai, Kia, Allswell, and JKL.

14.     Plaintiffs, on behalf of the Hyundai and Kia Discrimination Classes (as defined below), seek lost wages and benefits, front pay, compensatory and punitive damages, pre-judgment and post-judgment interest, and attorneys' fees and costs, for Hyundai, Kia, Allswell, and JKL's Title VII and Section 1981 violations.

15.     Plaintiffs, on behalf of the Tax Fraud Subclass (as defined below), seek statutory damages and attorneys' fees and costs for Allswell's filing of false information returns with the IRS.

16.     Plaintiffs and similarly situated TN visa holders also seek back wages, liquidated damages, and attorneys' fees and costs for Hyundai, Kia, Allswell, Lee, and JKL's violations of the FLSA.

## THE PARTIES

17.     Plaintiffs are citizens of Mexico and Hispanic persons of Mexican ancestry and national origin.

18.     Plaintiffs came to the U.S. on a TN visa to work for Defendants Hyundai, Kia, Allswell, and/or JKL.

19.     Plaintiffs and putative Class members are non-U.S. citizens, Hispanic,

and of Mexican national origin.

20.     Plaintiff Aquino currently resides in the State of Alabama and works for Defendants Hyundai, Kia, and Allswell in West Point, Georgia.

21.     Plaintiff Cruz currently resides in the State of Pennsylvania and worked for Defendants Hyundai and Allswell in West Point, Georgia.

22.     Plaintiff Zapata currently resides in the State of Georgia and worked for Defendants Hyundai and Allswell in West Point, Georgia.

23.     Plaintiff Arellano is a resident of Mexico and worked for Defendants Hyundai and Allswell in West Point, Georgia.

24.     Plaintiff Ramirez currently resides in the state of Texas and worked for Defendants Hyundai, Kia, and Allswell in West Point, Georgia.

25.     Plaintiff Salazar is a resident of Mexico and worked for Defendants Hyundai, Kia, and Allswell in West Point, Georgia.

26.     Plaintiff Olan is a resident of Mexico and worked for Defendants Kia and Allswell in West Point, Georgia.

27.     Plaintiff Perez currently resides in the state of Texas and worked for Defendants Hyundai, Kia, and JKL in West Point, Georgia.

28.     As Plaintiffs Aquino, Cruz, Zapata, Arellano, Ramirez, Salazar, and Olan have worked for Allswell at the Hyundai/Kia plant, Plaintiffs will refer to them collectively as the "Allswell Plaintiffs."

29.     As Plaintiff Perez has worked for JKL at the Hyundai/Kia plant, Plaintiffs will refer to him as the "JKL Plaintiff."

30.     As Plaintiffs Aquino, Cruz, Zapata, Arellano, Ramirez, Salazar, and Perez have worked for Hyundai at the Hyundai/Kia plant, Plaintiffs will refer to them collectively as the "Hyundai Claimants."

31.     As Plaintiffs Aquino, Ramirez, Salazar, Olan, and Perez have worked for Kia at the Hyundai/Kia plant, Plaintiffs will refer to them collectively as the "Kia Claimants."[2]

32.     At all relevant times, each Plaintiff was an "employee" of Defendant Kia, Hyundai, Allswell, and/or JKL within the meaning of Title VII and was employed by one or more of those parties within the meaning of the FLSA.

33.     At all relevant times, each Plaintiff was a party to an employment contract with Defendant Kia, Hyundai, Allswell, and/or JKL within the meaning of 42 U.S.C. § 1981 and the common law of Georgia. Plaintiffs consent in writing to

---

[2] As noted above, Plaintiffs Aquino, Ramirez, Salazar, and Perez worked at times for both Hyundai and Kia at the Hyundai/Kia plant, and so they are both Hyundai Claimants and Kia Claimants.

become party Plaintiffs in this action for claims under the FLSA. *See* Exh. 1.

34.     At all relevant times, Plaintiffs and other similarly situated employees were each a "person" within the meaning of that term as defined by the federal and Georgia RICO statutes. *See* 18 U.S.C. § 1961(3), O.C.G.A. § 16-14-6(c).

35.     Defendant Hyundai is a Georgia limited liability company with its principal place of business at 7001 Kia Parkway, West Point, Georgia 31833.

36.     Hyundai is a car parts company which helps form the parts and service arm for Hyundai Motor Company, Genesis Motors, and Kia Motors.

37.     Defendant Kia Georgia is a foreign profit corporation registered in Delaware with its principal place of business at 7777 Kia Parkway, West Point, Georgia 31833.

38.     Kia Georgia manufactures Kia vehicles for Kia Motors Corporation and is a 100% owned subsidiary of Kia Corporation, which is a 17.42% owner of Hyundai Mobis Co., Ltd.

39.     Hyundai Mobis Co., Ltd. also owns 100% of Defendant Hyundai.

40.     Consistent with their common ownership, Defendants Hyundai and Kia each have operations in the Hyundai/Kia plant. The plant produces parts for Hyundai, Kia, and Genesis brand cars and assembles Kia brand cars.

41.    At the Hyundai/Kia plant, Defendant Hyundai provides the parts for Kia cars and Defendant Kia uses those parts to build its cars. Defendant Hyundai and Kia also share employees and resources and communicate with one another in an effort to achieve the plant's production goals.

42.    Specifically, Defendant Hyundai supplies complete cockpit modules and front and rear chassis modules, as well as bumper assemblies, dashboard instrument panels, and vehicle suspensions—which it builds at the Hyundai/Kia plant—to Defendant Kia for final assembly in a Kia vehicle at that location.

43.    Defendant Hyundai is the largest direct supplier of final product to Defendant Kia.

44.    According to Defendant Hyundai's job postings, its operation at the Hyundai/Kia plant was designed to contribute to increased competitiveness, easier assembly, effective inventory control, and cost reduction for Hyundai Motor Company, Genesis Motors, and Kia Motors.

45.    Defendant Allswell is a limited liability company with its principal place of business at 124 Big Horn Drive, Newnan, Georgia 30265.

46.    Defendant Youngjin Lee, an individual, resides in Newnan, Georgia, and is listed as SPJ's CEO and Allswell's Secretary with the Georgia Secretary of State.

47.     Defendant Lee additionally held himself out as Allswell's president on job offer letters from Allswell.

48.     At all relevant times, Defendant Lee was an "employer" of Plaintiffs Aquino, Cruz, Zapata, Arellano, Ramirez, Salazar, Olan, and other similarly situated workers within the meaning of the FLSA, 29 U.S.C. § 203(d), in that he was an owner and manager of Allswell and held and exercised the authority to hire and fire employees, set and issue pay, and otherwise establish and control day-to-day working conditions.

49.     Allswell is a staffing company that provides laborers to work at other companies, including Defendants Hyundai and Kia.

50.     Defendant JKL is an Alabama limited liability company with its principal place of business located inside the Hyundai/Kia plant at 7001 Kia Parkway, West Point, GA 31833.

51.     JKL is a staffing company that provides laborers to work at other companies, including Defendants Hyundai and Kia.

52.     At all relevant times, Defendants Hyundai, Kia, Allswell, and JKL were each an "employer" within the meaning of Title VII and the FLSA.

53.     At all relevant times, Defendants Hyundai, Kia, Allswell, and JKL were each parties to a contract of employment with certain Plaintiffs within the meaning

of 42 U.S.C. § 1981 and the common law of Georgia.

54.    Defendant SPJ Connect, Inc. is a Georgia limited liability company with its principal place of business at 124 Big Horn Dr., Newnan, Georgia 30265.

55.    SPJ Connect is a labor recruitment company that recruits foreign national workers to work for companies in the U.S., including Defendants Hyundai, Kia, Allswell, and JKL.

56.    TESS is a Georgia domestic limited liability company, with its principal place of business at 2430 Green Mountain Dr., Braselton, Georgia 30517.

57.    TESS is a labor recruitment company that recruits foreign national workers to work for companies in the U.S., including Defendants Hyundai, Kia, and JKL.

58.    At all relevant times, each Defendant was a "person" within the meaning of the federal RICO, in that it is an individual or an entity capable of holding a legal or beneficial interest in property. 18 U.S.C. § 1961(3).

59.    Defendants Hyundai, Kia, Allswell, and JKL are each engaged in commerce or in the production of goods for commerce.

60.    Defendants Hyundai, Kia, Allswell, and JKL each have a gross volume of sales made or business done of not less than $500,000 per year.

11

## JOINT EMPLOYMENT ALLEGATIONS

### The Hyundai Claimants

61.    At all relevant times, Hyundai and Allswell, or Hyundai and JKL (as applicable), jointly employed the Hyundai Claimants as FLSA non-exempt employees to work at the Hyundai/Kia plant. The Hyundai Claimants received training, supervision, and/or direction regarding how to perform their job from their respective joint employers and supervisors for work performed at the Hyundai/Kia plant.

62.    Hyundai contracted Allswell and JKL for the performance of work by the Hyundai Claimants and others at the Hyundai/Kia plant, and Hyundai retained substantial control over the terms and conditions of workers recruited by Allswell and JKL such that Hyundai was a "joint employer" along with Allswell and JKL.

63.    The Hyundai supervisors who directed the Hyundai Claimants' work wore shirts with a Hyundai logo.

64.    The Allswell supervisors directing the Hyundai Claimants' work wore a vest with an Allswell logo.

65.    Hyundai and Allswell supervisors told the Hyundai Claimants which station to work at, instructed them on how to perform their job, and monitored and corrected their work.

12

66.     At all relevant times, Hyundai and Allswell employed Hyundai Claimants Plaintiffs Aquino, Cruz, Zapata, Arellano, Ramirez, and Salazar, and Olan and other similarly situated workers within the meaning of Title VII and the FLSA.

67.     At all relevant times, Hyundai and JKL employed Hyundai Claimant Plaintiff Perez and other similarly situated workers within the meaning of Title VII and the FLSA.

**The Kia Claimants**

68.     At all relevant times, Kia and Allswell or Kia and JKL (as applicable) jointly employed the Kia Claimants to work as FLSA non-exempt employees at the Hyundai/Kia plant. Plaintiffs received training, supervision, and/or direction regarding how to perform their jobs from Kia and Allswell supervisors or from Kia and JKL supervisors (as applicable) for work performed at the Hyundai/Kia plant.

69.     Defendants Kia and Allswell or Kia and JKL (as applicable) contracted for the performance of work by the Kia Claimants and others at the Hyundai/Kia plant, and Kia retained sufficient control over the terms and conditions of Allswell's and JKL's employees to constitute a "joint employer" along with Allswell and JKL.

70.     The Kia supervisors who directed the Kia Claimants' work wore shirts with a Kia logo, and the Allswell supervisors directing the Kia Claimants' work wore a vest with an Allswell logo. Kia supervisors and Allswell supervisors told the Kia

Claimants which station to work at, instructed them on how to perform their job, and corrected their work.

71.    At all relevant times, Kia and Allswell employed Kia Claimants Aquino, Ramirez, Salazar, and Olan and other similarly situated workers within the meaning of Title VII and the FLSA.

72.    At all relevant times, Kia and JKL employed Kia Claimant Plaintiff Perez and other similarly situated workers within the meaning of Title VII and the FLSA.

## JURISDICTION AND VENUE

73.    This Court has subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331 and § 1332.

74.    The Court has pendent jurisdiction over Plaintiffs' state law claims for breach of contract because they are part of the same case or controversy as their federal claims. 28 U.S.C. § 1367.

75.    The Court has personal jurisdiction over all Defendants because they all reside in the State of Georgia.

76.    Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c), as well as 18 U.S.C. § 1965(a) and 42 U.S.C. § 2000e–5(f)(3).

## <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

77.    On August 10, 2022, Plaintiff Aquino timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants Hyundai and Allswell.

78.    On September 14, 2022, the EEOC issued to Plaintiff Aquino a Notice of Right to Sue against Defendants Hyundai and Allswell.

79.    On November 2, 2022, Plaintiff Olan timely filed a Charge of Discrimination with the EEOC against Defendants Kia and Allswell.

80.    On December 14, 2022, the EEOC issued to Plaintiff Olan a Notice of Right to Sue against Defendants Kia and Allswell.

81.    Mr. Aquino and Ms. Olan timely bring the Title VII claims herein, as their claims in the instant action were filed within 90 days of the EEOC's issuance of their respective Notices of Right to Sue.

82.    All members of the putative Discrimination Classes who may not have filed charges of discrimination against Defendants with the EEOC will be entitled to rely upon the single-filing rule set forth in *Calloway v. Partners Nat'l Health Plans,* 986 F. 2d 446 (11th Cir. 1993).

83.    Alternatively, if the Kia Claimants and/or Hyundai claimants who were not recruited by Allswell are not entitled to rely on Plaintiff Aquino's and Plaintiff

Olan's Notices of Right to Sue under the single-filing rule,

    a.   On December 15, 2022, Plaintiff Perez filed a filed a Charge of Discrimination with the EEOC against Defendants JKL, Hyundai, and Kia alleging violations of Title VII; and

    b.   Plaintiff Perez will request a Notice of Right to Sue, and, promptly upon receipt, will seek leave to confirm the same with the Court.

## STATEMENT OF FACTS

### *The TN visa Program*

84.    The North American Free Trade Agreement ("NAFTA"), which came into force on January 1, 1994, created a special trade relationship between the United States, Mexico, and Canada. *See generally,* North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M 289 (1993).

85.    The U.S. government created the TN nonimmigrant classification, commonly known as the TN visa, to permit Mexican and Canadian professionals in certain occupations ("TN profession") to temporarily enter the United States for employment within their profession. *See* 8 C.F.R. § 214.6(a).

86.    Engineer and Scientific Technician/Technologist are among the categories of professionals permitted entry into the United States with TN visas. *See*

16

8 C.F.R. § 216.4(c) (incorporating Appendix 1603.D.1 to Annex 1603 of the NAFTA).

87.　A Mexican citizen applying for a TN visa:

> must present documentation sufficient to satisfy the consular officer … that the applicant is seeking entry to the United States to engage in business activities for a United States employer(s) or entity(ies) at a professional level, and that the applicant meets the criteria to perform at such a professional level. This documentation may be in the form of a letter from the prospective employer(s) in the United States or from the foreign employer, and must be supported by diplomas, degrees or membership in a professional organization…The documentation shall fully affirm:
>
> (A) The [TN] profession of the applicant;
>
> (B) A description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity;
> (C) The anticipated length of stay;
> (D) The educational qualifications or appropriate credentials which demonstrate that the … Mexican citizen has professional level status; and
> (E) The arrangements for remuneration for services to be rendered.

8 C.F.R. § 214.6(d)(3)(ii).

88.　The TN visa applicant "must engage in a prearranged business activity at a professional level for a U.S. or foreign employer." 9 F.A.M. § 402.17-5(A).

89.　Once an applicant has provided the required evidence set forth in the preceding paragraph, the applicant is admitted under the TN visa classification for a period of up to three years. *See* 8 C.F.R. § 214.6(e).

90.    The TN visa is tied to the associated employer for the duration of the TN visa period unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers. 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker).

91.    Since 1997, the number of TN visas issued has increased significantly every year, except for 2020 due to the COVID-19 pandemic. For example, in 1997, 287 TN visas were issued to Mexican nationals.[3] By 2007, the number had increased to 4,060.[4] In 2017, it had grown to 15,993 visas.[5] In 2021, 24,881 TN visas were issued to Mexican nationals.[6]

---

[3] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 1998), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY1998_NIV_Detail_Table.pdf (last viewed Nov. 4, 2022).
    [4] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2007), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY07NIVDetailTable.pdf (last viewed Nov. 4, 2022).
    [5] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2017), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY17NIVDetailTable.pdf (last viewed Nov. 4, 2022).
    [6] *See* Nonimmigrant Visas Issuances by Visa Class and Nationality, U.S. Department of State (FY 2021), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY21NIVDetailTable.pdf (last viewed Nov. 4, 2022).

92.     Government oversight of TN visa holders' working conditions in the United States is limited. As a consequence, there have been multiple reports of abuses—including misrepresentations in employment contracts—of TN workers,[7] as well as several lawsuits.[8]

### *Defendants' Fraudulent Scheme*

93.     The fraudulent acts described herein were committed by (1) Defendants Hyundai, Kia, Allswell, and SPJ through RICO Enterprise I (as defined in paragraphs 563-619, *infra*) and conspiring with Defendants JKL and TESS; (2) Defendants Hyundai, Kia, JKL, and TESS through RICO Enterprise II (as defined in paragraphs 620-670, *infra*), and conspiring with Defendant Allswell and SPJ; or, in the alternative, (3) all Defendants through RICO Enterprise III (as defined in paragraphs 671--725, *infra*).  *See* Exhibit 28, RICO Enterprise Chart.

### **SPJ and Allswell**

94.     SPJ is a labor recruiter based in Hogansville, Georgia and with offices

---

[7] Coerced under NAFTA: Abuses of Migrant Workers in the TN visa Program and Recommendations for Reform, Centro de los Derechos del Migrante (Dec. 2017), https://cdmigrante.org/wp-content/uploads/2018/01/Coerced-under-NAFTA_-Abuses-of-Migrant-Workers-in-TN-Visa-Program.pdf (last viewed March 25, 2022).

[8] *See, e.g., Martinez-Rodriguez v. Giles*, 31 F.4th 1139 (9th Cir. 2022); *Castellanos v. Wordlwide Distribution Sys. USA, LLC,* No. 2:14-CV-12609, 2016 WL 11678220, at *8 (E.D. Mich. June 20, 2016).

in Mexico.

95.   SPJ served as the first point of contact for Plaintiffs and other similarly situated employees in Mexico who were hired through Allswell and have worked at the Hyundai/Kia plant.

96.   SPJ regularly advertises new job vacancies for its affiliated company Defendant Allswell.

97.   On LinkedIn, SPJ promotes itself as being a "trilingual law firm that assists US companies recruit highly skilled workers via the TN Visa Process."[9]

98.   SPJ also claims its "goal is to help our US clients save time and money by providing all the support needed to get a TN Visa Approval for all of their candidates."

99.   SPJ executive Yadira Leos stated that the company has roughly 500 vacancies to fill every month.

100.  Allswell claims to be an "engineer staffing solution." *See* Allswell Engineering Staffing Solutions, https://allswellproducts.com (last visited Dec. 15, 2022).

101.  Allswell's website further states: "we help clients fill a wide range of positions and needs. We also offer the possibility of hiring the candidate directly.

---

[9] https://www.linkedin.com/company/spj-connect/ (last viewed Dec. 16, 2022).

The work must be within the United States-Mexico-Canada Agreement (USMCA), including computer analysts, engineers and technologist."

102.   Allswell further explains its recruitment process on its website: "Once we identify the potential candidates, their resumes are sent to the client for analysis. Then the relevant interviews follow all necessary procedures to ensure the joint choice of the best candidates."

103.   Allswell's website explains also that it helps to secure legal services to help its job applicants obtain work TN visas.

104.   Defendants SPJ and Allswell advertised job opportunities with Defendants Hyundai and Kia at multiple universities and other locations in Mexico.

105.   Defendants SPJ and Allswell promote their services on Facebook and other social media, claiming they can help workers "fulfill [their] dream of working legally in the United States."

106.   The services provided by SPJ and Allswell include assisting Mexican nationals with preparing and submitting TN visa applications to the U.S. Embassy and Consulates in Mexico in order to gain authorization for those individuals to come to the U.S. and work for Allswell. Allswell, in turn, places workers at various manufacturers, including Defendants Hyundai and Kia.

107.   SPJ and Allswell brought hundreds of Mexican nationals to the United

States to work at the Hyundai/Kia plant in West Point, Georgia, through their coordinated effort as described above.

108.   Allswell is a Georgia-based staffing agency that has a contract with Hyundai and Kia to provide workers at the Hyundai/Kia plant.

109.   SPJ and Allswell share the same registered agent address, which is a residential home in Newnan, Georgia.

110.   Youngjin Lee is listed as the CEO for SPJ and as the secretary for Allswell on the Georgia Secretary of State's Corporations Division website.

111.   Youngjin Lee is known as Paul Lee to the TN visa holders.

112.   Allswell began operations as a staffing company in Georgia in October 2016.

113.   By June 2020, Allswell started operations to seek Mexican workers for employment in the United States through the TN visa program.

114.   By October 2020, Allswell began employing TN visa candidates for non-technical work in the U.S. automotive industry.

115.   As of October 2022, Allswell had over 500 TN visa holders employed at different companies in the United States, entirely or almost entirely in the Deep South.

## TESS and JKL

116.   TESS is a labor recruiter based in Braselton, Georgia and with offices in Mexico.

117.   TESS recruited and hired TN visa candidates to work under JKL at the Hyundai/Kia plant.

118.   TESS served as the first point of contact for Plaintiff Perez starting on or around March 10, 2022. TESS also served as the recruiter and initial point of contact for similarly situated employees in Mexico who were brought to work for Hyundai and Kia through JKL.

119.   According to TESS's website, it "is the most efficient recruiting and staffing company in the market." It claims to "provide TN-Visa workers and help companies scale for growth" and "have over 10 years of experience providing recruiting and staffing services."[10]

120.   On LinkedIn, TESS promotes itself as having "provid[ed] headhunting services for automotive companies in Alabama and Georgia for the last 10 years" with specialties in "HHRR, AUTOMOTIVE, ENGINEER, TECHNICIAN, TN VISA, and MANUFACTURE."[11]

---

[10] *See* https://tessus-mex.com/about-us/ (last viewed Dec. 9, 2022)
[11] *See* https://www.linkedin.com/company/clglobalgroup (last visited Dec. 9, 2022).

121.  On Facebook, TESS claims in a Spanish-language post that it is "one of the recruitment agencies with the most contracts and job offers in the United States for Mexican professionals" and highlights its "permanent recruitment" for jobs in the automotive industry.[12]

122.  Beginning at least as early as October 2019 and continuing through at least March 2022, TESS advertised professional job opportunities in the automotive industry at multiple universities and other places in Mexico.

123.  JKL is an Alabama-based staffing agency whose "main office," according to its website, "is currently located inside the Mobis Georgia Plant."[13]

124.  According to its website, JKL "employee [sic] more than 150 team members." It also claims to "offer services such as Logistics, Production Assembly, Quality Management, etc."[14]

125.  TESS and JKL assist Mexican nationals in preparing and submitting applications to the U.S. Consulate for TN visas in order to gain authorization for those individuals to come to the U.S. and work for JKL. JKL, in turn, places workers at various manufacturers, including Defendants Kia and Hyundai.

---

[12]  *See*  https://www.facebook.com/TESS.LLC.USA/photos/pb.100063647858317.-2207520000./807930433920042/?type=3 (last visited Dec. 9, 2022).

[13]  *See* https://www.jklogisllc.com/4801.html (last visited Dec. 9, 2022).

[14]  *Id.*

126.   TESS and JKL brought Plaintiff Perez and similarly situated Mexican nationals to the United States to work at the Hyundai/Kia plant in West Point, Georgia, through their coordinated effort described above.

### *Plaintiffs' Statement of Facts*

### **Plaintiff Jorge Oswaldo Aquino Martinez**

127.   Mr. Aquino was born and raised in Mexico and is a citizen of Mexico.

128.   Mr. Aquino is a skilled technician and engineer.

129.   In Mexico, Mr. Aquino attended Universidad Tecnológica de Tijuana to become an engineer with an emphasis in mechatronics.

130.   Mr. Aquino applied for an engineering job posted by SPJ in hopes of being able to come to the United States to expand his skills and earn a better living.

131.   On April 18, 2022, Allswell wrote a letter to Mr. Aquino offering him the job of Production Technician at the Hyundai/Kia plant at 7001 Kia Parkway, West Point, Georgia. (Exh. 2).

132.   The letter indicated, among other things, that:

a.   His "initial pay rate may be from $11.00" which it calculated to be "$33,687.50 on an Annualized Basis.";

b.   He would be provided with housing support for one year equivalent to $3,000;

c.  He would be provided with 8 weeks transportation support equivalent to $600;

d.  He would be reimbursed up to $400 for his travel expenses from Mexico to the U.S.;

e.  Overall, the letter stated that his final compensation would be $37,687.50; and

f.  Additionally, the letter indicated that $67.50 would be deducted from his biweekly checks for "water, electricity, trash pickup, landscaping, internet, rent insurance, among other things."

133.    This offer letter was signed by Allswell Vice President Seungbae Park.

134.    Mr. Aquino signed the agreement on April 20, 2022, indicating he "accept[ed] and agree[d] to the terms and conditions of the employment." (Exh. 2).

135.    After Mr. Aquino applied, SPJ coordinated Mr. Aquino's employment with Allswell by providing information and support relating to his visa application to the United States Consulate in Mexico.

136.    In an effort to get Mr. Aquino a TN visa so he could come to work in at the Hyundai/Kia plant, SPJ prepared a TN visa support letter pursuant to 8 C.F.R. 214.6(D)(3) dated May 16, 2022, which was addressed to the United States Consulate in Mexico. The support letter was on Allswell letterhead and signed by

Allswell's Vice President Seungbae Park. (Exh. 3).

137.   The support letter to the U.S. Consulate outlined, among other things, that Allswell "requires a Scientific Technician/Technologist in the Production services division." *Id.*

138.   Allswell's letter to the consulate stated that in order to qualify for this professional position, a person needs to have "(a) theoretical knowledge of any of the following disciplines: agricultural sciences, astronomy, biology, chemistry, engineering, forestry, geology, geophysics, meteorology, or physics; and (b) the ability to solve practical problems in any of those disciplines, or the ability to apply principles of any of those disciplines to basic or applied research." *Id.*

139.   Allswell's letter further explained that Mr. Aquino was qualified for the TN visa as a scientific technician/technologist because he met the qualifications described in the preceding paragraph.

140.   Allswell further detailed that Mr. Aquino's job duties included the following technical services, among others: "Provide assistance to junior operators in their assigned responsibilities"; "Evaluate equipment performance and recommend improvements"; and "Recommend process improvements to enhance operational efficiency and safety."

141.   Although unknown to Mr. Aquino, the required job qualifications and

the position description provided in the job offer and support letter to secure the TN visa were false.

142.   Also unknown to Mr. Aquino, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at Hyundai.

143.   On or around May or June 2022, Mr. Aquino travelled to the U.S. Consulate in Mexico City for an interview to obtain a TN visa.

144.   Mr. Aquino incurred travel and food costs which were not reimbursed.

145.   Mr. Aquino paid $160 to apply for the TN visa. This cost was also not reimbursed.

146.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Aquino was successful, and a TN visa was granted for Mr. Aquino to work on a temporary basis in the United States at Hyundai in West Point, Georgia.

147.   In reliance on the promises made by SPJ and Allswell concerning the job promised to him and his eligibility for that job under U.S. law, Mr. Aquino moved from Mexico to the United States to begin work at the Hyundai/Kia manufacturing plant in West Point.

148.   On or around July 13, 2022, Mr. Aquino started working for Allswell and Hyundai.

149.   When Mr. Aquino began the job, he had already expended significant

costs and expenses to travel to the United States, and he had foregone other employment opportunities.

150. Mr. Aquino immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform technical services as promised by SPJ and Allswell and as required for a TN visa, Mr. Aquino was required to perform manual labor on a production line.

151. The production line work required no technical skill and involved the repetitive installation of parts on approximately 400-500 cars each shift.

152. During Mr. Aquino's employment, he has been paid $13.50 per hour.

153. Mr. Aquino works alongside employees of Allswell and Hyundai and is supervised and receives instruction on how to perform his job from Hyundai supervisors.

154. The Hyundai supervisors directing Mr. Aquino's work wear a shirt with a Hyundai logo, and Allswell supervisors wear a vest with an Allswell logo.

155. The Hyundai supervisors tell Mr. Aquino which station to work at, instruct him on how to perform his job, and monitor and correct his work.

156. Allswell supervisors also monitor Mr. Aquino's attendance, communicate his schedule at Hyundai, and issue his paychecks.

157. Mr. Aquino is required to work overtime. He works 12-hour shifts and

alternates between working five-day workweeks and six-day workweeks.

158.   Defendants Allswell and Hyundai have made it clear to Mr. Aquino that the aforementioned hours and schedule are mandatory.

159.   Mr. Aquino works for Kia and Hyundai on the production line at the Hyundai/Kia plant performing manual labor.

160.   He assembles and installs about 400-500 dashboards into cars each day for Defendant Hyundai.

161.   When one of the parts he assembled for Defendant Hyundai isn't installed correctly in a finished or nearly finished Kia automobile, he is directed to work for Defendant Kia and reinstalls specific components, so the installation is finished correctly.

162.   As a result of the type of work Mr. Aquino is required to perform, he suffers pain and numbness in his hands.

163.   Mr. Aquino does not perform the technical services he was promised or that required the job qualifications SPJ and Allswell indicated were necessary for the position.

### Plaintiff Elvis Nahum Cruz Vasquez

164.   Mr. Cruz was born and raised in Mexico and is a citizen of Mexico.

165.   He is a skilled technician and engineer.

166.   Mr. Cruz completed the curriculum for Mechanical Engineering from the Instituto TE in Mexico.

167.   For the last five years, Mr. Cruz worked as a mechanical engineer for contractors in Mexico.

168.   In January 2022, Mr. Cruz was introduced to the scheme participants through SPJ's Facebook page and applied for an engineering job online.

169.   Mr. Cruz applied for an engineering job posted by SPJ in hopes of being able to come to the United States to expand his skills and earn a better living.

170.   On January 20, 2022, SPJ recruiter Elizabeth Cantu emailed Mr. Cruz and explained that in order to begin the application process, he needed send over a list of required documents. Mr. Cruz provided the required documents the same day.

171.   On March 3, 2022, at 4:50 p.m., Alvis Rodriguez from SPJ e-mailed Mr. Cruz and invited him to a Zoom meeting: "Hello! How are you? We want to invite you to a meeting directed by the Director of SPJ – Lic. Yadira Leos, where we will resolve your doubts about recruitment and we will give you additional information so that you are fully prepared to continue with your hiring process." (Exh. 4).

172.   During the Zoom meeting, Ms. Leos never made any indications that Mr. Cruz would be hired for anything other than a qualified, technically skilled

engineer position pursuant to a TN visa.

173.   Mr. Cruz also communicated with SPJ recruiters Elizabeth Cantu and Jose Gamez, who repeatedly told Mr. Cruz that he would be hired for an engineer position configuring machines at the Hyundai/Kia plant and servicing and providing maintenance for those machines.

174.   Mr. Cruz was never told that the job for which he applied was a manual labor position on a production line.

175.   After interviewing Mr. Cruz, SPJ provided Mr. Cruz's application and other information to its affiliated company, Allswell.

176.   Allswell sent Mr. Cruz a letter on March 24, 2022 offering Mr. Cruz a job as Production Technician at Hyundai located at 7001 Kia Parkway, West Point, Georgia. (Exh. 5).

177.   The offer letter stated, among other things, that:

   a.   His "initial pay rate may be from $11.00" which it calculated to be "$36,850 on an Annualized Basis;"

   b.   He would be provided with housing support for one year equivalent to $3,000;

   c.   He would be provided with 8 weeks transportation support equivalent to $600;

d. He would be reimbursed up to $400 for his travel expenses from Mexico to the U.S.;

e. Overall, the letter stated that his final compensation would be $40,850; and

f. Additionally, the letter indicated that $67.50 would be deducted from his biweekly checks for "water, electricity, trash pickup, landscaping, internet, rent insurance, among other things." *Id.*

178. The offer letter was signed by Allswell Vice President Seungbae Park. *Id.*

179. Plaintiff Cruz signed the offer letter indicating he "accept[ed] and agree[d] to the terms and conditions of the employment." *Id.*

180. SPJ continued to coordinate Mr. Cruz's employment with Allswell by providing information and directives relating to his TN visa application.

181. In an effort to get Mr. Cruz a TN visa so he could come to work in the United States, Allswell prepared a support letter to the U.S. Consulate pursuant to 8 C.F.R. 214.6(d)(3), which was presented to the consulate as part of a required submission for Mr. Cruz's TN visa application. (Exh. 6).

182. SPJ provided the support letter to Mr. Cruz for inclusion with his TN visa application.

33

183.   Elizabeth Cantu and Jose Gamez from SPJ also told Mr. Cruz that during his consulate interview, if anyone at the consulate asked how he found out about the TN visa job, that he should say that he found out about the job on his own through LinkedIn, which was not true.

184.   Mr. Cruz made no such misrepresentation.

185.   Elizabeth Cantu and Jose Gamez further told Mr. Cruz that he should not tell anyone at the consulate during his TN visa interview that anyone helped him navigate the TN visa process. This was also not true.

186.   Mr. Cruz made no such misrepresentation.

187.   In anticipation of Mr. Cruz's TN visa interview with the U.S. Consulate, SPJ provided him via e-mail with a list of documents to bring with him to the interview, including the support letter printed in color. SPJ also sent him instructions recommending that he wear a formal outfit, maintain composure, demonstrate security, only provide information or documentation the consular official specifically requests, and learn about the company he would be working for, including the work he was told he would perform. (Exh. 7).

188.   The instructions further state (in Spanish, translated to English): "PLEASE BE READY TO ANSWER QUESTIONS ABOUT THE SUPPORT LETTER…" *Id.*

189.   The instructions further list "possible questions and suggested answers," including some of the following:

a.   "What does the company do? A: IT IS AN AUTOMOTIVE COMPANY… (add WHAT YOU HAVE LEARNED THAT COMES IN THE SUPPORT LETTER, IN YOUR OWN WORDS, INVESTIGATE ON THE WEB PAGE OF THE COMPANY/EMPLOYER WHAT IT DOES EXACTLY, WHAT IT PRODUCES, ETC. […]";

b.   "What are your work activities to be performed? A: Here answer the ones that are in your support letter in the part that says: "His main job duties include the following")"

c.   "Describe how your studies and career are compatible with the employer in the United States. A: BECAUSE I HAVE EXPERIENCE IN THAT, THAT'S WHAT I DO HERE IN MEXICO… (PLUS WHATEVER YOU CAN ADD THAT IS RELATED TO THE QUESTION)."

d.   "Why is the applicant qualified? A: BECAUSE I HAVE EXPERIENCE IN THAT, THAT'S WHAT I DID HERE IN MEXICO. (Plus add all you can say that is related)"

35

e.  Did someone help you complete the TN visa process? No, I did it myself, and the company sent me the letters.

f.  What do you do here in Mexico? What are your activities in your current job? IN THIS ANSWER YOU MUST MAKE IT CLEAR TO THE CONSUL THAT WHAT YOU DO IN YOUR CURRENT JOB IS THE SAME THING YOU ARE GOING TO DO AT THE COMPANY THAT IS HIRING YOU.

g.  "How did you find out about the vacancy? I FOUND IT IN AN AD ON LINKEDIN, THE COMPANY ANNOUNCED THE VACANCY AND I SENT MY CV TO THE EMAIL INDICATED IN THE AD, AFTER THEY CONTACTED ME AND THE INTERVIEWS WERE ONLINE WITH THE COMPANY CONTACTS (Each candidate had the interview with people from the company and mention with whom they had an interview)." *Id.*

190.  Mr. Cruz said what he understood was the truth in his interview.

191.  The support letter SPJ provided to Mr. Cruz was (a) dated April 1, 2022, (b) addressed to the United States Consulate in Mexico, (c) on Allswell letterhead, and (d) signed by Allswell's Vice President Seungbae Park. (Exh. 6).

192.  The support letter outlined, among other things, that Allswell "requires

36

a Scientific Technician/Technologist in the Production services division."  The letter further provided that the Scientific Technician/Technologist would be placed at the Hyundai/Kia plant as a full-time employee; and that he would be supervised by both Allswell and Hyundai. *Id.*

193.   Allswell's support letter acknowledged and stated that in order to qualify for this professional position, a person needs to have "(a) theoretical knowledge of any of the following disciplines: agricultural sciences, astronomy, biology, chemistry, engineering, forestry, geology, geophysics, meteorology, or physics; and (b) the ability to solve practical problems in any of those disciplines, or the ability to apply principles of any of those disciplines to basic or applied research." *Id.*

194.   Allswell's support letter further explained that Mr. Cruz was qualified for the TN visa as a scientific technician/technologist because he met the qualifications described above.

195.   Allswell's support letter further detailed that Mr. Cruz's job required the technical services including, among others: "Perform regular equipment maintenance to ensure production capacity and quality"; "Provide assistance to junior operators in their assigned responsibilities"; "Evaluate equipment performance and recommend improvements"; and "Recommend process

improvements to enhance operational efficiency and safety."

196.   Although unknown to Mr. Cruz, the required job qualifications and position description provided in the job offer and support letter to secure the TN visa were false.

197.   Also unknown to Mr. Cruz, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at Hyundai.

198.   On April 28, Mr. Cruz travelled to the U.S. Embassy in Mexico City for an interview to obtain a TN visa.

199.   Mr. Cruz incurred travel and food costs which were not reimbursed.

200.   Mr. Cruz paid $160 to apply for the TN visa. This cost was also not reimbursed.

201.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Cruz was successful; in reliance on the misrepresentations SPJ and Allswell made, the U.S. government issued Mr. Cruz a TN visa to work on a temporary basis in the United States at Hyundai in West Point, Georgia.

202.   In reliance on the promises made by SPJ and Allswell concerning the job promised to him and his eligibility for that job under U.S. law, Mr. Cruz moved from Mexico to Alabama, near his place of work in West Point, Georgia.

203.   On or around May 1, 2022, Mr. Cruz started working for Hyundai at its

car manufacturing plant in West Point.

204.   When Mr. Cruz began the job, he had already expended significant costs and expenses to travel to the U.S. and forego other employment opportunities.

205.   Mr. Cruz immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform technical services as promised by SPJ and Allswell and as required for a TN visa, Mr. Cruz was required to perform manual labor on a production line.

206.   The production line work required no technical skill and involved the repetitive installation of approximately 400-500 dashboards into cars each day.

207.   At the beginning of Mr. Cruz's employment, he was paid $11.00 per hour, but his pay later increased to $13.50 per hour.

208.   Mr. Cruz received supervision and direction regarding how to perform his job from both Hyundai and Allswell supervisors during the course of his joint employment with these Defendants. Hyundai and Allswell supervisors controlled his job duties and directed him on how to perform the assigned manual labor tasks.

209.   In addition to the non-technical, repetitive, production line manual labor which was a different position than promised, Mr. Cruz was required to work substantial overtime.

210.   He worked 12 hours shifts. He alternated between working a five-day

workweek and a six-day workweek.

211.   Overall, Mr. Cruz worked approximately 60-72 hours per week for Defendants Allswell and Hyundai.

212.   Defendants Allswell and Hyundai made it clear to Mr. Cruz that overtime was mandatory.

213.   Mr. Cruz asked his supervisors at Allswell if he could work 40 hours per week, but he was repeatedly told that he had to work every day he was on the schedule for 12 hours per day.

214.   Allswell supervisors also told Mr. Cruz that they must follow the Hyundai schedule and if he does not work all the scheduled hours, he would get a "bad mark" against him, have "red tags" put on him, and that his TN visa could be cancelled.

215.   Mr. Cruz was exhausted from working up to 72 hours per week.

216.   When he explained this to his supervisor, he was told that he must show up to work, and that if he did not, someone would come to his apartment to pick him up and bring him to work.

217.   Mr. Cruz spent his entire 12-hour shift using his hands in repetitive motions.

218.   As a result, Mr. Cruz's back, hands, and feet hurt, and he was constantly

exhausted.

219.   Allswell and Hyundai discriminated against Mr. Cruz during his employment.

220.   While Mr. Cruz was required to work 60-72 hours per week under threat of termination and deportation, other Hyundai employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were only required to work 40 hours per week without threat of termination.

221.   While Mr. Cruz was paid $11.00 to $13.50 per hour, other Hyundai employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were paid significantly more for the same job duties and with less experience and qualifications.

222.   Because of the fraudulent conduct of Allswell, SPJ, and Hyundai and the broken promises relating to employment and the discrimination, Mr. Cruz sought and secured another TN visa job that properly placed him in a skilled engineer position and provided better, non-discriminatory compensation.

223.   August 31, 2022 was Mr. Cruz's last day working for Defendants Allswell and Hyundai.

224.   Allswell and Hyundai never paid Mr. Cruz for his last day of work.

225.   Mr. Cruz's new employer required that he obtain a new TN visa

41

because the TN visa that had been granted was tainted by the Allswell, SPJ, and Hyundai's fraud.

226.   The fraudulent TN visa thus caused Mr. Cruz more damages: he was required to travel back to Mexico for the purpose of applying for and obtaining a new TN visa.

227.   Mr. Cruz incurred the following travel costs to return to Mexico:

    a.   Approximately $70 to secure a ride to the Atlanta airport;

    b.   $287.49 for a plane ticket to return to Mexico from Atlanta; and

    c.   $50 for gas and tolls once he arrived in Mexico to travel home.

228.   On September 19, 2022, Mr. Cruz was required to travel from Puebla, Mexico to Mexico City to obtain fingerprints for his new TN visa application.

229.   Mr. Cruz further incurred more expenses relating to the travel to Mexico City on September 19, 2022.

230.   Mr. Cruz also paid $400 for a TN visa that would be valid for 4 years.

231.   On September 20, Mr. Cruz travelled from the city of Puebla, Mexico to Guadalajara, Mexico for an interview at the U.S. Consulate to obtain a TN visa.

232.   Mr. Cruz incurred some of the following expenses related to this travel:

    a.   $54 for travel costs to the Central Bus Station;

    b.   Approximately $10 for food and drinks;

c.  Approximately $35 for a hotel at Hotel Isabel; and

d.  Approximately $12 a roundtrip Uber ride between his hotel and the consulate.

233.  On October 1, 2022, Mr. Cruz traveled from Mexico to Pennsylvania to begin his new job.

### Plaintiff Heber Alfonso Zapata Contreras

234.  Mr. Zapata was born and raised in Mexico and is a citizen of Mexico.

235.  He is a skilled technician and engineer.

236.  Mr. Zapata earned a Bachelor's degree in Industrial Engineering from the Universidad Autonoma de Tamaulipas in Mexico.

237.  For the last four years, Mr. Zapata worked as an engineer in Mexico.

238.  In the Fall of 2020, Mr. Zapata was introduced to the scheme participants through SPJ's LinkedIn advertisement and applied for an engineering job online.

239.  Mr. Zapata applied for an engineering job posted by SPJ in hopes of being able to come to the United States to expand his skills and earn a better living.

240.  In the Fall of 2020, Mr. Zapata communicated with SPJ recruiters Yadir Leos, Valeria Vegas, and Joram Morales, who repeatedly told Mr. Zapata that he would be hired for an engineer position.

43

241.   Mr. Zapata was never told that the job involved non-technical manual labor.

242.   After interviewing Mr. Zapata, SPJ provided his application and other information to its affiliated company, Allswell.

243.   Allswell sent Mr. Zapata a letter on November 11, 2020 offering him a job as a Maintenance & Production Technician for Allswell. (Exh. 8).

244.   The offer letter stated, among other things, that:

   a.   His yearly compensation would be $44,000;

   b.   His hourly wage rate and annual amount is $10.00 - $12.00 / $33,000 - $38,000; and

   c.   Other benefits included 2 weeks of vacation, 1 year of housing and vehicle support, and holiday over-time pay. *Id.*

245.   The offer letter was signed by Allswell Director SJ Jung. *Id.*

246.   Plaintiff Zapata signed the offer letter on the same day, indicating: "I hereby fully understand and agree to the Terms and Conditions of the Job Offer above and gladly accept it…" *Id.*

247.   SPJ continued to coordinate Mr. Zapata's employment with Allswell by providing information on his behalf to the United States Consulate in Mexico to obtain a TN visa.

248.   In an effort to get Mr. Zapata a TN visa so he could come to work in the United States, Allswell prepared a required support letter pursuant to 8 C.F.R. 214.6(d)(3), which was submitted to the consulate as part of Mr. Zapata's TN visa application. (Exh. 9).

249.   SPJ provided the support letter to Mr. Zapata for inclusion in his TN visa application.

250.   The support letter SPJ provided to Mr. Zapata was (a) dated November 13, 2020, (b) addressed to the United States Consulate in Mexico, (c) on Allswell letterhead, and (d) signed by Allswell's President, Sunghee Cho. *Id.*

251.   The support letter outlined, among other things, that Allswell had offered a Production Engineer position to Mr. Zapata. *Id.*

252.   The support letter further explained that as a Production Engineer, Mr. Zapata would be assigned to work at the "Mobis Alabama, LLC – Georgia Plant" located at 7001 Kia Parkway, West Point, Georgia 31833. *Id.*

253.   Allswell's support letter acknowledged that the Production Engineer position was "specialized in nature, and falls within the schedule of permitted TN occupations – Engineer – authorized by NAFTA." *Id.*

254.   The support letter further stated:

As a Production Engineer, he will utilize his academic background in Industrial Engineering and professional experiences in the field of Production

45

Engineering to support the company in the development, analysis, improvement, and implementation of process definition and control procedures, management, of the flow of materials and equipment specifications, and process yield capabilities to help improve the efficiencies. His main job duties will include the following:

- Develop, evaluate, and improve operations processes; Utilize a sequential flow pattern in the process; Minimize backtracking of work in the process; Implement a predictable process.
- Analyze, develop and optimize work flows within the production process across all departments to improve efficiency throughout the company.
- Review KPI monitoring systems to determine ways to improve company operations and eliminate waste.
- Create an analytical process that justifies new business opportunities while helping sales team develop an optimized process to secure new business opportunities.
- Develop best practices, routines and innovate new solutions to improve production rates and overall part quality.
- Work closely with the Quality team to create, improve and develop standardized work instructions.
- Apply engineering, science, and business skills to carry out core functions in the fabrication and assembly of products.
- Develop & implement activity plans for projects and rotate PDCA (Plan-Do-Check-Action) including budget, spec., schedule, management, start-up, evaluations, and presentations.
- Confer with management, engineering, and other staff regarding manufacturing capabilities, production schedules, and other considerations to facilitate production processes and reduce costs. *Id.*

255.   The support letter further explained that Mr. Zapata was qualified for

TN status as a Production Engineer for the following reasons:

- Mr. Heber Alfonso Zapata Contreras is a Mexican citizen and is well qualified for the job position offered;
- The employment offered to Mr. Heber Alfonso Zapata Contreras is at a specialized level;

46

- Mr. Heber Alfonso Zapata Contreras possesses the requisite professional qualifications to perform the duties at a professional level;
- The position offered is temporary, for up to three years in duration; and
- Mr. Heber Alfonso Zapata Contreras intends to return to Mexico at the completion of the proposed assignment. *Id.*

256.   The support letter outlined that Allswell proposed to hire Mr. Zapata for a temporary period of three years with a compensation of "$44,000 per year plus a standard package of employee benefits including housing and transportation." *Id.*

257.   Although unknown to Mr. Zapata, the required job qualifications and position description provided in the job offer and support letter to secure the TN visa were false.

258.   Also unknown to Mr. Zapata, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at Hyundai.

259.   On December 2, 2020, Mr. Zapata travelled to the U.S. Embassy in Mexico City for an interview to obtain a TN visa.

260.   Mr. Zapata incurred approximately $930 USD in travel costs, which were not reimbursed.

261.   Mr. Zapata paid $160 to apply for the TN visa. This cost was not reimbursed.

262.   The next day, on December 3, 2020, Mr. Zapata had an interview at the U.S. Embassy regarding his TN visa application.

47

263.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Zapata was successful; in reliance on the misrepresentations SPJ and Allswell made, the U.S. government issued a TN visa for Mr. Zapata to work on a temporary basis in the United States for Allswell.

264.   In reliance on the promises made by SPJ and Allswell concerning the job promised to him and his eligibility for that job under U.S. law, Mr. Zapata moved from Mexico to Georgia in early December 2020.

265.   On or around December 15, 2020, Mr. Zapata started working for Hyundai at its car manufacturing plant in West Point, Georgia.

266.   When Mr. Zapata began the job, he had already expended significant costs and expenses to travel to the United States, and he had foregone other employment opportunities.

267.   Mr. Zapata immediately learned that the job he had been promised did not exist (or at least did not exist for him).  Rather than perform technical services as promised by SPJ and Allswell and as required for a TN visa, Mr. Zapata was required to perform manual labor on a production line.

268.   The production line work required no technical skill and involved the repetitive production line installation of front and rear bumpers, intercooler, hardware, and shocks.

269.   During Mr. Zapata's employment, he was initially paid $10.50 per hour. His hourly rate was increased to $11.00 per hour later in his employment.

270.   Mr. Zapata received supervision and direction regarding how to perform his job from both Hyundai and Allswell supervisors during the course of his joint employment with these Defendants. Hyundai and Allswell supervisors controlled his job duties and directed him on how to perform the assigned manual labor tasks.

271.   In addition to the non-technical, repetitive, production line manual labor which was a different position than promised, Plaintiff was required to work substantial overtime.

272.   He worked 12-hour shifts. He alternated between working a five-day workweek and a six-day workweek.

273.   Overall, Mr. Zapata worked approximately 60-68 hours per week for Defendants.

274.   Defendants Allswell and Hyundai made it clear to Mr. Zapata that overtime was mandatory.

275.   Mr. Zapata spent his entire 12-hour shift using his hands in repetitive motions.

276.   As a result, Mr. Zapata's back, hands, and feet hurt, and he was

constantly exhausted.

277.   Allswell and Hyundai discriminated against Mr. Zapata during his employment.

278.   While Mr. Zapata was required to work 60-68 hours per week under threat of termination and deportation, other Hyundai employees who were employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were only required to work 40 hours per week without threat of termination.

279.   While Mr. Zapata was paid $10.50 per hour, other Hyundai employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were paid significantly more for the same job duties and with less experience and qualifications.

280.   Because of the fraudulent conduct of Allswell, SPJ, and Hyundai, the broken promises relating to his employment, and the discrimination, Mr. Zapata began to seek other TN visa job opportunities so that he could be properly placed in a skilled engineer position with non-discriminatory compensation.

281.   On July 26, 2021, Defendant Lee (who held himself out as the owner of SPJ and Allswell, and signed support letters in this case) entered Plaintiff Zapata's apartment and threatened him and another co-worker with deportation if they

continued to apply for other jobs.

282.   Because of the fraudulent conduct of Allswell, SPJ, and Hyundai, the broken promises relating to employment and the discrimination, Mr. Zapata resigned from his employment with Allswell and Hyundai.

283.   August 20, 2021 was Plaintiff Zapata's last day working for Allswell and Hyundai.

284.   Allswell paid Plaintiff Zapata's wages "off the books" for at least two pay periods when he started working.

285.   Allswell did not take Social Security or income tax withholdings from Plaintiff Zapata's wages during this period.

286.   Allswell fraudulently and willfully did not report this portion of Plaintiff Zapata's earnings to the IRS in Allswell's quarterly and annual returns.

### Plaintiff Jose Maria Ramirez Morales

287.   Mr. Ramirez was born and raised in Mexico and is a citizen of Mexico.

288.   He is a skilled technician and engineer.

289.   Mr. Ramirez earned a Bachelor's degree in Mechatronics Engineering from the Instituto Technologico Superior de Irapuato in Mexico.

290.   For over two years, he worked as an engineer in Mexico.

291.   In October or November 2020, Mr. Ramirez was introduced to the

scheme participants through SPJ's LinkedIn advertisement, and he applied for an engineering job online.

292.  Mr. Ramirez applied for the engineering job posted by SPJ in hopes of being able to come to the United States to expand his skills and earn a better living.

293.  On November 12, 2020, Mr. Blue Kim from SPJ sent Mr. Ramirez a job offer letter from Allswell and wrote: "First, let me thank you for your time and dedication during your selection process with us and the company for which you applied. Hard work and dedication will always pay off for people who pursue their dreams just like you. Few of us are fortunate enough to have this kind of opportunity during the pandemic with the lack of work we are experiencing in our country. […] CONGRATULATIONS AGAIN AND WE WISH YOU SUCCESS IN THIS NEW PROFESSIONAL STAGE!" (Exh. 10).

294.  On November 16, 2020, Mr. Ramirez received an email from Recruiter Aidee Leos M. of  SPJ. The email stated in Spanish (translated to English):

> Hello. Good morning. I hope you are well. We are going to start with our visa process and the law firm needs you to send them the following documentation as soon as possible and fill out the DS160 format as completely as possible.
>
> -  Certificate, Title, and Professional License
> -  Resume
> -  Passport
>
> Please send it as soon as possible. (Exh. 11).

295.   On November 18, 2020, Mr. Ramirez responded with the requested documents. (Exh. 12).

296.   Mr. Ramirez communicated with SPJ recruiters Aidee Leos M., Blue Kim, and Julia Vega who repeatedly told Mr. Ramirez that he would be hired for an engineer position.

297.   Mr. Ramirez was never told that the job involved non-technical manual labor.

298.   After interviewing Mr. Ramirez, SPJ provided his application and other information to its affiliated company, Allswell.

299.   Allswell sent Mr. Ramirez a letter on November 19, 2020 offering him a job as a Maintenance Engineer for Allswell. (Exh. 13).

300.   The offer letter stated, among other things, that the annual salary for this job would be "$42,000 (Full time)" and that the employment period was "up to three years from November 31, 2020, but contingent upon the approval of TN-2 petition by the U.S. CIS." *Id.*

301.   The offer letter was signed by Allswell President Sunghee Cho. *Id.*

302.   SPJ continued to coordinate Mr. Ramirez's employment with Allswell by providing information on his behalf to the United States Consulate in Mexico to obtain a TN visa.

303.   In an effort to get Mr. Ramirez a TN visa so he could come to work in the United States, Allswell prepared a required support letter pursuant to 8 C.F.R. 214.6(d)(3), which was submitted to the consulate as part of Mr. Ramirez's TN visa application. (Exh. 14).

304.   SPJ provided the support letter to Mr. Ramirez.

305.   The support letter was (a) dated November 19, 2020, (b) addressed to the United States Consulate in Mexico (c)  on Allswell letterhead, and (d) signed by Allswell's President, Sunghee Cho. *Id.*

306.   The support letter outlined, among other things, that Allswell had offered Mr. Ramirez a Maintenance Engineer position, and he would be assigned to work at 7001 Kia Parkway, West Point, Georgia 31833, at the "Mobis Alabama, LLC – Georgia Plant." *Id.*

307.   Allswell's support letter acknowledged that the Maintenance Engineer position was "specialized in nature, and falls within the schedule of permitted TN occupations – Engineer – authorized by NAFTA. As the Maintenance Engineer, [Plaintiff Ramirez] will utilize his academic background in Mechatronics Engineering and professional experience in the field of Maintenance Engineering to improve production facilities with most efficiency and quality, reducing the incidence of costly breakdowns using the appropriate technology for the company.

54

Also, he will be charged with managing workers on the maintenance area, ensuring

they all work together as a team and follow protocols." *Id.*

308.   The support letter further detailed that Mr. Ramirez's job duties would

include the following:

- Provide engineering expertise in the processes and activities for maintaining all plant machines, equipment and other physical assets to ensure safe, continual and efficient operation.
- Develop maintenance strategies through the analysis of technological factors for the maintenance master plan that guarantees the availability and reliability focus maintenance process of the plant.
- Review KPI monitoring systems to determine ways to improve company operations and eliminate waste.
- Plan and execute preventive maintenance schedules of various equipment to increase machine up time and equipment reliability -routine preventative, corrective, predictive and shutdowns works.
- Perform corrective and preventive maintenance activities on systems to provide continuous performance of production machines and equipment and other systems required for operations.
- Ensure that periodic predictive, preventive and corrective maintenance of all plant equipment, machinery, facilities and other physical assets are appropriately scheduled and accomplished and that emergency and maintenance support are readily available as needed.
- Maintain communications and relations as necessary to report on the status of matters requiring action and to ensure that corrective action is planned and undertaken and proper documentation in computer based predictive and preventive maintenance management system (CMMS) of work performed.
- Ensure compliance with safety regulations, regulatory organizations (OSHA), quality systems compliance requirements, and maintenance of a clean and orderly work environment.

*Id.*

309.   The support letter further explained that Mr. Ramirez was qualified for

TN status as a Maintenance Engineer for the following reasons

- Mr. Jose Maria Ramirez Morales is a Mexican citizen and is well qualified for the job position offered;
- The employment offered to Mr. Jose Maria Ramirez Morales is at a specialized level;
- Mr. Jose Maria Ramirez Morales possesses the requisite professional qualifications to perform the duties at a professional level;
- The position offered is temporary, for up to three years in duration; and
- Mr. Jose Maria Ramirez Morales intends to return to Mexico at the completion of the proposed assignment.

*Id.*

310.   The support letter outlined that Allswell proposed to hire Mr. Ramirez

55

for a temporary period of three years with compensation of "$42,000 per year plus a standard package of employee benefits including housing and transportation." *Id.*

311.   Although unknown to Mr. Ramirez, the required job qualifications and position description  provided in the job offer and support letter to secure the TN visa were false.

312.   Also unknown to Mr. Ramirez, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at Hyundai and Kia.

313.   On November 30, 2020, Mr. Ramirez travelled to the U.S. Consulate in Guadalajara, Mexico for an interview to obtain a TN visa.

314.   Mr. Ramirez incurred approximately $350 in travel and food costs which were not reimbursed.

315.   Mr. Ramirez paid $160 to apply for the TN visa. This cost was not reimbursed.

316.   On December 1, 2020, Mr. Ramirez received an email from Joram Morales who provided detailed instructions regarding the travel details for Mr. Ramirez's trip to the United States. (Exh. 15).

317.   On December 6, 2020, Mr. Ramirez received an email from Recruiter Aidee Leos at SPJ, copying SPJ recruiters Blue Kim and Julia Vega, reminding him,

56

among other things, to wear safety shoes and wishing him an excellent start "to a great challenge that will push you to grow professionally and personally." (Exh. 16).

318.   On December 8, 2020, SJ Jung from SPJ (who also worked for Allswell at the same time, according to his LinkedIn page), advised Mr. Ramirez that he would inform him  about the address where he would be staying the night before his arrival in the U.S. and add him to Kakao (a messaging application) so they could communicate further upon his arrival. (Exh. 17).

319.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Ramirez was successful; in reliance on the misrepresentations SPJ and Allswell made, the U.S. government issued a TN visa for Mr. Ramirez to work on a temporary basis for Defendant Allswell.

320.   In reliance on the promises made by SPJ and Allswell concerning the job promised to him and his eligibility for that job under U.S. law, Mr. Ramirez moved from Mexico to Georgia on or about December 19, 2020.

321.   On or around December 20, 2022, Mr. Ramirez started working for Hyundai on the production line at its manufacturing plant in West Point, Georgia.

322.   After approximately seven or eight months working on the Hyundai production line at the Hyundai/Kia plant, Mr. Ramirez began working directly for Kia at the Hyundai/Kia plant.

323.   When Mr. Ramirez began the job, he had already expended significant costs and expenses to travel to the U.S. and forego other employment opportunities.

324.   Mr. Ramirez immediately learned that the job he had been promised did not exist (or at least did not exist for him).  Rather than perform technical services as promised by SPJ and Allswell and as required for a TN visa, Mr. Ramirez was required to perform manual labor on a production line.

325.   The production line work required no technical skill and involved the repetitive  installation of bumpers, mufflers, shocks, airbags, horns, lights, hoses, and screws.

326.   During Mr. Ramirez's employment, he was paid between $10.50 and $13 per hour.

327.   During the course of his employment with Defendants, Mr. Ramirez received supervision and direction regarding how to perform his job from Hyundai and Kia supervisors at their respective production lines, and from Allswell supervisors. Hyundai, Kia, and Allswell supervisors controlled his job duties and directed him on how to perform the assigned manual labor tasks.

328.   In addition to the non-technical, repetitive, production line manual labor which was a different position than promised, Mr. Ramirez was required to work substantial overtime.

329.   He worked 12-hour shifts. He alternated between working a five-day workweek and a six-day workweek.

330.   Overall, Mr. Ramirez worked approximately 60-72 hours per week for Defendants.

331.   Defendant Allswell made it clear to Mr. Ramirez that overtime was mandatory.

332.   Mr. Ramirez spent his entire 12-hour shift using his hands in repetitive motions.

333.   As a result, Mr. Ramirez's back, hands, and feet hurt, and he was constantly exhausted.

334.   Allswell, Hyundai, and Kia discriminated against Mr. Ramirez during his employment.

335.   While Mr. Ramirez was required to work 60-72 hours per week under threat of termination and deportation, other Hyundai and Kia employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were only required to work 40 hours per week without threat of termination.

336.   While Mr. Ramirez was paid between $10.50 and $13.00 per hour, other Hyundai and Kia employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were paid significantly more for the same job duties

and with less experience and qualifications.

337.   Because of the fraudulent conduct, broken promises, and discrimination, Mr. Ramirez began to seek other TN visa job opportunities so that he could be properly placed in a skilled engineer position with non-discriminatory compensation.

338.   Because of the fraudulent conduct, broken promises, and discrimination, Mr. Ramirez resigned from his employment with Defendants.

339.   Mr. Ramirez last worked for Defendants in November 2021.

340.   Allswell paid Mr. Ramirez's wages "off the books" for at least two pay periods when he started working.

341.   Allswell did not take Social Security or income tax withholdings from Mr. Ramirez's wages during this period.

342.   Allswell fraudulently and willfully did not report this portion of Mr. Ramirez's earnings to the IRS in Allswell's quarterly and annual returns.

### Plaintiff Luis Adrian Salazar Lozano

343.   Mr. Salazar was born and raised in Mexico and is a citizen of Mexico.

344.   He is a skilled technician and engineer.

345.   Mr. Salazar earned a Bachelor's degree in Mechanical Engineering from the Instituto Tecnológico de Aguascalientes in Mexico.

346.    Mr. Salazar has over seven years of engineering experience in Mexico.

347.    In October or November 2020, Mr. Salazar was introduced to the scheme participants through SPJ's LinkedIn advertisement and applied for an engineering job online.

348.    Mr. Salazar applied for an engineering job posted by SPJ in hopes of being able to come to the United States to expand his skills and earn a better living.

349.    Mr. Salazar communicated with SPJ recruiters Blue Kim and Joram Morales who repeatedly told Mr. Salazar that he would be hired for an engineer position.

350.    Mr. Salazar was never told that the TN visa job involved any manual labor.

351.    After interviewing Mr. Salazar, SPJ provided his application and other information to its affiliated company Allswell.

352.    Allswell sent Mr. Salazar an offer letter on November 13, 2020 offering him a job as a Quality Control Engineer. (Exh. 18).

353.    The offer letter stated, among other things, that his annual salary would be $44,000 (full time) and that the employment period was "up to three years from November 27, 2020, but contingent upon the approval of TN-2 petition by the U.S. CIS." *Id.*

354.   The offer letter was signed by Allswell President Sunghee Cho. *Id.*

355.   SPJ continued to coordinate Mr. Salazar's employment with Allswell by providing information on his behalf to the United States Consulate in Mexico to obtain a TN visa.

356.   In an effort to get Mr. Salazar a TN visa so he could come to work in the United States, Allswell prepared a required support letter pursuant to 8 C.F.R. 214.6(d)(3), which was submitted to the U.S. Consulate as part of Mr. Salazar's TN visa application. (Exh. 19).

357.   SPJ provided the support letter to Mr. Salazar for inclusion in his TN visa application.

358.   In anticipation of Mr. Salazar's TN visa interview with the U.S. Consulate, Joram Morales from SPJ emailed him on November 16, 2020 and attached a copy of instructions on how to handle the interview.  The instructions outlined the documents he should bring to the consulate, the types of questions he might be asked, and suggested answers. The document says it is from a "Mexican Lawyer." (Exh. 20).

359.   The instructions (in Spanish, translated to English) advise Mr. Salazar to "PLEASE BE READY TO ANSWER QUESTIONS ABOUT THE SUPPORT LETTER." *Id.*

360.   The instructions further list "possible questions and suggested answer," including some of the following:

a.   "What does the company do? A: IT IS AN AUTOMOTIVE COMPANY….. (add WHAT YOU HAVE [LEARNED] THAT COMES IN THE SUPPORT LETTER, IN YOUR OWN WORDS INVESTIGATE ON THE PAGE OF THE COMPANY THEY ARE GOING TO, EXACTLY WHAT IT PRODUCES, ETC)";

b.   "What are your work activities to be performed? A: (The ones that come in your support letter are answered here in the part that says: "His main job duties include the following")";

c.   "Describe how your studies and career are compatible for the employer in the United States. A: BECAUSE I HAVE EXPERIENCE IN THAT, THAT'S WHAT I DO HERE IN MEXICO… (PLUS WHATEVER THEY MAY ADD THAT IS RELATED TO THE QUESTION)";

d.   "Why is the applicant qualified? A: BECAUSE I HAVE EXPERIENCE IN THAT, THAT'S WHAT I DO HERE IN MEXICO. (Plus what you can add that is related)"; and

e.   "What do you do here in Mexico? What are your activities in your

current job? IN THIS ANSWER YOU MUST MAKE IT CLEAR TO

THE CONSUL THAT WHAT YOU DO IN YOUR CURRENT JOB

IS THE SAME THING YOU ARE GOING TO DO AT THE

COMPANY THAT IS HIRING YOU." *Id.*

361.   The support letter SPJ provided to Mr. Salazar was (a) dated November

13, 2020, (b) addressed to the United States Consulate in Mexico, (c) on Allswell

letterhead, and (d) signed by Allswell's President, Sunghee Cho. (Exh. 19).

362.   The support letter outlined, among other things, that Allswell had

offered Mr. Salazar a Quality Control Engineer position. *Id.*

363.   The support letter further explained that as a Quality Control Engineer,

Mr. Salazar would be assigned to work, in the Mobis Alabama, LLC – Georgia Plant

at  7001 Kia Parkway, West Point, Georgia 31833. *Id.*

364.   Allswell's support letter acknowledged that the Quality Engineer

position was a professional position that warranted a TN visa. *Id.*

365.   The support letter further detailed that Mr. Salazar's job duties would

include the following:

- Manage overall quality control activities in our plant;
- Analyze engineering specifications and manufacturing processes to determinate standards and stablish quality and reliability objectives of finished product;

- Apply statistical methods and perform mathematical calculations to identify the cause of quality problems;
- Document quality problems and suggest solutions for quality issues;
- Assist product developers with detecting and resolving product defects;
- Coordinate quality control objectives and activities to resolve production problems, maximize product reliability, and minimize costs;
- Communicate with management to develop acceptable production and design standards;
- Direct and develop test plans and automated testing tools;
- Ensure compliance with the clients´ product specifications and implement quality control objectives and activities;
- Analyze product data to identify causes of recurring quality problems; and
- Maintain ISO certification by ensuring our company´s compliance with ISO policies.

*Id.*

366.   The support letter further explained that Mr. Salazar was qualified for

TN status as a Quality Control Engineer for the following reasons:

- Mr. Luis Adrian Salazar Lozano is a Mexican citizen and is well qualified for the job position offered;
- The employment offered to Mr. Luis Adrian Salazar Lozano is at a specialized level;
- Mr. Luis Adrian Salazar Lozano possesses the requisite professional qualifications to perform the duties at a professional level;
- The position offered is temporary, for up to three years in duration; and
- Mr. Luis Adrian Salazar Lozano intends to return to Mexico at the completion of the proposed assignment.

*Id.*

367.   The support letter outlined that Allswell proposed to hire Mr. Salazar

for a temporary period of three years with a compensation of "$44,000 per year plus

a standard package of employee benefits including housing and transportation." *Id.*

368.   Although unknown to Mr. Salazar, the required job qualifications and

65

position description provided in the job offer and support letter to secure the TN visa were false.

369.   Unknown to Mr. Salazar, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at Hyundai.

370.   On or about November 20, 2020, Mr. Salazar travelled to the U.S. Consulate in Guadalajara, Mexico for an interview to obtain a TN visa. He had to remain in Guadalajara for a second appointment at the consulate three days later.

371.   Mr. Salazar incurred approximately $200 in travel and food costs which were not reimbursed.

372.   Mr. Salazar paid $160 to apply for the TN visa. This cost was not reimbursed.

373.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Salazar was successful; in reliance on SPJ's and Allswell's misrepresentations, the U.S. issued Mr. Salazar a TN visa to work on a temporary basis in the United States for Defendant Allswell.

374.   In reliance on the promises made by SPJ and Allswell concerning the job promised to him and his eligibility for that job under U.S. law, Mr. Salazar moved from Mexico to Georgia on or about November 30, 2020.

375.   On or around December 4, 2020, Mr. Salazar started working for

Hyundai at its car manufacturing plant in West Point, Georgia.

376.   After approximately seven or eight months working for Hyundai at the Hyundai/Kia plant, Mr. Salazar began to work directly for Kia at the same plant.

377.   When Mr. Salazar began the job, he had already expended significant costs and expenses to travel to the United States, and he had foregone other employment opportunities.

378.   Mr. Salazar immediately learned that the job he had been promised did not exist (or at least did not exist for him).  Rather than perform technical services as promised by SPJ and Allswell and as required for a TN visa, Mr. Salazar was required to perform manual labor on a production line.

379.   The production line work required no technical skill and involved the repetitive production line installation of bumper panels, front suspensions, speakers, and air ducts.

380.   During Mr. Salazar's employment, he was paid between $10.50 and $13.00 per hour.

381.   Mr. Salazar received supervision and direction regarding how to perform his job from Hyundai and Kia supervisors at their respective production lines, and from Allswell supervisors. Hyundai, Kia, and Allswell supervisors controlled his job duties and directed him on how to perform the assigned manual

labor tasks.

382.   In addition to the non-technical, repetitive, production line manual labor which was a different position than promised, Mr. Salazar was required to work substantial overtime.

383.   He worked 12-hour shifts, and alternated between working a five-day workweek, and then a six-day workweek.

384.   Overall, Mr. Salazar worked approximately 60-72 hours per week for Defendants.

385.   Defendant Allswell made it clear to Plaintiff Salazar that overtime was mandatory.

386.   Mr. Salazar spent his entire 12-hour shift using his hands in repetitive motions.

387.   As a result, Mr. Salazar's back, hands, and feet hurt, and he was constantly exhausted.

388.   Allswell, Hyundai, and Kia discriminated against Mr. Salazar during his employment.

389.   While Mr. Salazar was required to work 60-72 hours per week under threat of termination and deportation, other Hyundai and Kia employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were only

required to work 40 hours per week without threat of termination.

390.  Mr. Salazar previously complained to his supervisor, Roberto Velasquez, and Allswell Director SJ Jung about the difference between the promised salary and the actual hourly wage he received to no avail.

391.  On or about December 20, 2020, Defendant Lee told Mr. Salazar and a group of his co-workers that they were being "too Mexican."  Mr. Lee repeated this insult on multiple occasions during Mr. Salazar's employment.

392.  While Mr. Salazar was paid between $10.50 per hour and $13.00 per hour, other Hyundai and Kia employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were paid significantly more for the same job duties and with less experience and qualifications.

393.  Because of the fraudulent conduct, broken promises, and discrimination, Mr. Salazar began to seek other TN visa job opportunities so that he could be properly placed in a skilled engineer position with non-discriminatory compensation.

394.  Because of the fraudulent conduct, broken promises, and discrimination, Mr. Salazar resigned from his employment with Defendants.

395.  Mr. Salazar last worked for Defendants in early October 2021.

396.  Allswell paid Mr. Salazar's wages "off the books" for at least two pay

periods when he started working.

397.   Allswell did not take Social Security or income tax withholdings from Mr. Salazar's wages during this period.

398.   Allswell fraudulently and willfully did not report this portion of Mr. Salazar's earnings to the IRS in Allswell's quarterly and annual returns.

### Plaintiff Isidro Arellano Chihuahua

399.   Mr. Arellano was born and raised in Mexico and is a citizen of Mexico.

400.   He is a university technician in mechatronics ("técnico superior universitario en mecatrónica") and mechatronics engineer ("ingeniero mecatrónico") with a license ("cedula") for both professions in Mexico.

401.   Mr. Arellano earned a degree in Mechatronics Engineering from the Universidad Tecnológica de Torreón in Mexico in 2020.

402.   Before traveling to work in the U.S., he worked in Mexico as a technician for approximately two years between 2017 and 2019, and in 2020 worked as an Engineering and Manufacturing Auxiliary.

403.   At the end of this meeting, Mr. Arellano left his CV with representatives of SPJ, and then, following instructions from University staff, he sent the CV by email to SPJ on April 1, 2021 to confirm his interest in applying for one the jobs for which SPJ was recruiting.

70

404.   Mr. Arellano was introduced to the scheme participants in March 2021, when SPJ representatives, including Jake Ayers, Yadira Leos, Julia Vega, and Lluvia García Orona held a meeting at the Universidad Tecnológica de Torreón in Mexico, seeking applications from Mexican engineers and technicians for auto production jobs in Georgia and Alabama. (Exh. 21).

405.   Mr. Arellano applied for the position in hopes of being able to come to the U.S. to expand his skills as a mechatronic technician and earn a better living.

406.   On April 1, 2021, Julia Vega, a Senior Headhunter with SPJ, called Mr. Arellano and told him there were positions available for production technicians at a company called Mando America in the State of Georgia.   She asked Mr. Arellano if he was interested in pursuing the recruitment process; Mr. Arellano confirmed that he was interested in the position.

407.   Mr. Arellano was never told that the TN visa job involved non-technical manual labor.

408.   Later on April 1, 2021, Ms. Vega emailed Mr. Arellano about a job vacancy that he could apply to with Allswell Products in Hogansville, Georgia. The job was for a Production Technician earning $35,000 per year plus overtime, and housing and transportation provided for one year.

409.   After interviewing Mr. Arellano, SPJ provided his application and other

information to its affiliated company Allswell.

410.   Allswell, through Jesus Baez of SPJ, emailed Mr. Arellano a letter on April 2, 2021 offering him a job as a Production Technician. (Exh. 22).

411.   The offer letter, which was dated April 1, 2021, stated, among other things, that Mr. Arellano's yearly compensation would be $40,000, his hourly / annual wage rate would be "$10.50-$12 / $35,000-$38,000" and other benefits would include 2 weeks of vacation, 1 year of housing and transportation support, and holiday over-time pay.

412.   The offer letter was signed by Defendant Lee (listed on the offer letter as "Paul Lee").

413.   In his communications with TN visa workers, Defendant Lee has held himself out to be the President of SPJ and Allswell.

414.   SPJ continued to coordinate Mr. Arellano's employment with Allswell by providing information on his behalf to the United States Consulate in Mexico to obtain a TN visa.

415.   In an effort to get Mr. Arellano a TN visa so he could come to work in the United States, Allswell prepared a required support letter pursuant to 8 C.F.R. 214.6(d)(3), which was submitted to the consulate as part of his TN visa application. (Exh. 23).

416.   SPJ provided the support letter to Mr. Arellano for inclusion in his TN visa application.

417.   In anticipation of Mr. Arellano's TN visa interview with the consulate, SPJ provided him with a "TN visa Interview Guide," which outlined the documents he should bring to the consulate, the types of questions he might be asked, and suggested answers. The document says it is from a "Mexican Lawyer." (Exhibit 24).

418.   The TN visa Interview Guide (in Spanish, translated to English) advised Mr. Arellano to "PLEASE BE READY TO ANSWER QUESTIONS ABOUT THE LETTER OF SUPPORT "SUPPORT LETTER." The guide further directs Mr. Arellano to "Study everything and prepare to answer in English. […] This is now totally your responsibility, since here we are giving you all the support and guidance so you know what to say and answer during your interview." *Id.*

419.   The instructions further list "possible questions and suggested answers," including some of the following:

   a.   "Who is your employer in the United States? A: Your employer is Allswell.";

   b.   "What does the company do? A: HERE YOU ARE GOING TO ANSWER WHAT THE COMPANY TO WHICH YOU ARE GOING TO BE ASSIGNED TO WORK DOES NOT ALLSWELL BECAUSE

73

ALLSWELL IS OUTSORCING [*sic*] AND WHAT THE CONSUL IS INTERESTED IN KNOWING IS WHAT THE COMPANY TO WHICH YOU ARE GOING TO BE ASSIGNED TO WORK DOES AND YOU CAN START LIKE THIS: …… IT IS AN AUTOMOTIVE COMPANY….. (add WHAT YOU HAVE RESEARCHED ON THE WEBSITE OF THE COMPANY EXACTLY WHAT IT DOES WHAT IT PRODUCES ETC) I SUGGEST YOU GOOGLE THE COMPANY YOU ARE GOING TO BE ASSIGNED TO WORK FOR SO THAT YOU KNOW WHAT IT DOES.";

c.   "What will be your position in the company? R = SCIENTIFIC TECHNICIAN/TECHNOLOGIST;

d.   "What are your work activities to perform? A: (Here you answer those listed in your support letter (it is a single document) in the part that says: "Pursuant to the legal framework described above, the Scientific Technician/Technologist is responsible for providing technical services at the XXXXXXXDepartment, including […];

e.   "Describe how your studies and career are compatible for the employer in the United States A: BECAUSE I HAVE EXPERIENCE IN THAT,

74

THAT'S WHAT I DO HERE IN MEXICO…HERE IT IS VERY IMPORTANT THAT THAT [*sic*] THERE BECONGRUENCE WITH WHY YOU ARE BEING HIRED FOR THIS POSITION, WHICH IS BECAUSE YOU HAVE EXPERIENCE IN SUCH ACTIVITIES."

f.   "Why is the applicant qualified? A: BECAUSE I HAVE EXPERIENCE IN THAT, THAT'S WHAT I DO HERE IN MEXICO. (Plus whatever you can add that is related)"; and

g.   "What do you do here in Mexico? What are your activities in your current job? IN THIS ANSWER YOU MUST MAKE IT CLEAR TO THE CONSUL THAT WHAT YOU DO IN YOUR CURRENT JOB IS THE SAME THING YOU ARE GOING TO DO AT THE COMPANY THAT IS HIRING YOU, THAT IT IS VERY SIMILAR TO THE ACTIVITIES YOU ARE GOING TO DO THERE AND THAT ARE LISTED IN YOUR SUPPORT LETTER OR SUPPORT LETTER."

h.   "Who is going to supervise you in the company? A qualified engineer will be supervising me." *Id.*

420.   The support letter SPJ provided to Mr. Arellano was (a) dated April 13,

2021, (b) addressed to the United States Consulate in Mexico, (c) on Allswell letterhead, and (d) signed by Allswell's President Sunghee Cho. (Exh. 23).

421.   The support letter outlined, among other things, that Allswell had offered him a Scientific Technician/Production Technician position for a period of three years. *Id.*

422.   Allswell's support letter acknowledged and stated that in order to qualify for this professional position, a person needs to have "(a) theoretical knowledge of any of the following disciplines: agricultural sciences, astronomy, biology, chemistry, engineering, forestry, geology, geophysics, meteorology, or physics; and (b) the ability to solve practical problems in any of those disciplines, or the ability to apply principles of any of those disciplines to basic or applied research." *Id.*

423.   Allswell's support letter further explained that Mr. Arellano was qualified for the TN visa as a scientific technician because he met the qualifications described above. *Id.*

424.   The support letter further explained that as a Scientific Technician, Mr. Arellano would be assigned to work at Mando America Corporation – Plant G2 in Hogansville, Georgia. *Id.*

425.   The support letter explained the terms of Mr. Arellano's employment

to be an annual salary of "$40,000 per year plus a standard package of employee benefits including housing and transportation." *Id.*

426.  Allswell further detailed that Mr. Arellano would be responsible for providing some of the following technical services if he was granted a TN visa for the Scientific Technician job:

- Technical support for process improvements and daily manufacturing engineering support to the plant floor
- Technical support to assist in developing a business plan
- Provide technical support for maintenance and production
- Technical support to develop and prepare capital projects.
- Develop best practices, routines, and innovate new solutions to improve production rates and overall part quality
- Optimize work flows within the production process to improve efficiency throughout the company. *Id.*

427.  Although unknown to Mr. Arellano, the position description provided in the job offer and support letter to secure the TN visa was false.

428.  Unknown to Mr. Arellano, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at Hyundai.

429.  On April 19, 2021, Mr. Arellano travelled to the U.S. Embassy in Mexico City for an interview to obtain a TN visa.

430.  Mr. Arellano incurred the following costs associated with obtaining the visa, none of which Defendants reimbursed: approximately $100 travel costs and $75 for a hotel to travel to Mexico City for his visa interview; and approximately

$160 to apply for the TN visa.

431.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Arellano was successful; in reliance on SPJ's and Allswell's misrepresentations, the U.S. government issued him a TN visa to work on a temporary basis in the United States.

432.   Although his Support Letter indicated that he would be assigned to work at the Mando Plant in Georgia, Mr. Arellano was actually assigned to work at the Hyundai/Kia plant in West Point, Georgia.

433.   In reliance on the promises made by SPJ and Allswell concerning the job promised to him and his eligibility for that job under U.S. law, Mr. Arellano moved from Mexico to LaGrange, Georgia, near his place of work in West Point, Georgia, on May 1, 2021.

434.   Mr. Arellano spent approximately $600 on a flight to Atlanta from Torreon, Mexico, plus approximately $130 on a taxi from the Atlanta airport to his housing in LaGrange. Defendants reimbursed only $530 of these costs.

435.   On or around May 3, 2021, Mr. Arellano started working for Hyundai at the Hyundai/Kia plant in West Point.

436.   When Mr. Arellano began the job, he had already expended significant costs and expenses to travel to the United States and to forego other employment

opportunities.

437.   Mr. Arellano immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform technical services as promised by SPJ and Allswell and as required for a TN visa, Mr. Arellano was required to perform manual labor on a production line.

438.   The production line work required no technical skill.

439.   Initially, Mr. Arellano was assigned to "logistics," where he would perform repetitive tasks, lifting and delivering steering columns and key sets to workers on the Hyundai production line. He worked in this area of the Hyundai/Kia plant from May until late July or early August 2021. During this period, he was paid $10.50 per hour.

440.   Starting in late July or early August 2021 until April 2022, Mr. Arellano was assigned to the production line, where he performed repetitive tasks assembling various pieces for Kia automobiles, such as T-bars and front bumpers. During this period, he was paid $12.50 per hour.

441.   Mr. Arellano received instructions regarding how to perform his job from both Hyundai and Allswell employees during the course of his joint employment with these Defendants. Hyundai and Allswell controlled his job duties.

442.   In addition to the non-technical, repetitive, production line manual labor, which was a different position than promised, Mr. Arellano was required to work substantial overtime.

443.   He worked 12-hour shifts.  From May through December 2021, he typically worked five-day workweeks; and beginning in or around January 2022 typically worked six-day workweeks.

444.   Overall, Mr. Arellano worked an average of 60-72 hours per week for Defendants.

445.   Mr. Arellano spent his entire 12-hour shift using his hands in repetitive motions and often engaged in heavy lifting.

446.   As a result, Mr. Arellano's back and feet often hurt during his employment.

447.   Allswell and Hyundai discriminated against Mr. Arellano during his employment.

448.   While Mr. Arellano was required to work on average 60-72 hours per week, other Hyundai employees who were U.S. citizens or nationals, non-Mexican, and non-Hispanic, were only required to work 40 hours per week.

449.   While Mr. Arellano was paid between $10.50 - $12.50 per hour, other Hyundai employees who were U.S. citizens or nationals, non-Mexican, and non-

Hispanic were paid significantly more for the same job duties and with less experience and qualifications.

450.   Because of the fraudulent conduct of Allswell, SPJ, and Hyundai, the broken promises relating to employment, and the discrimination, Mr. Arellano engaged in protected activity and complained throughout his employment about the type of manual labor work he was required to perform, the lack of promised pay increases, and workplace safety issues. In two instances, these complaints escalated to threatened work stoppages.

451. On March 31, 2022, Allswell notified Mr. Arellano that his employment was being terminated effective April 18, 2022.

452.   As a result of Mr. Arellano's unlawful termination, Allswell and SPJ cancelled his pending TN visa renewal application.

453.   Mr. Arellano subsequently spent approximately $500 on a flight home to Mexico and $80 for baggage fees. Defendants did not reimburse these costs.

454.   Since being fired, Mr. Arellano has not been able to secure new employment.

455.   During Mr. Arellano's initial period of employment at the Hyundai/Kia plant, from May 2021 through approximately September 2021, he was

paid via Allswell company checks, but on information and belief, Allswell did not withhold sufficient federal taxes from these wage payments.

456.   Mr. Arellano's wages for the time period from May 2021 through September 2021 were not reflected on the 2021 IRS Form W-2 that Allswell provided to Mr. Arellano.

## Plaintiff Veronica Olan Castillo

457.   Ms. Olan was born and raised in Mexico and is a citizen of Mexico.

458.   She is a skilled engineer.

459.   In 2013, Ms. Olan earned a Bachelor's degree in Industrial Engineering from the Instituto Tecnológico Superior in Huimangillo, State of Tabasco, Mexico.

460.   For about six years before coming to the United States, Ms. Olan worked as an engineer in Mexico.

461.   In or about June or July 2021, Ms. Olan was introduced to the scheme participants through SPJ's LinkedIn and Facebook advertisement and applied for an engineering job online.

462.   Ms. Olan's father died of COVID while she was applying for her TN visa. She continued the application process in hopes of being able to come to the United States to expand her skills and to provide financial support for her mother.

463. Ms. Olan communicated with SPJ recruiters Elizabeth Cantu, Mariana Cavazo, and Aracely Isais, who repeatedly told Ms. Olan that she would be hired for an engineer position.

464. Ms. Olan was never told that the TN visa job involved any manual labor.

465. After interviewing Ms. Olan, SPJ provided her application and other information to its affiliated company Allswell.

466. Allswell sent Ms. Olan a letter on August 18, 2021 offering her a job as a Maintenance & Production Technician for Allswell.

467. The offer letter stated, among other things, that:

    a. Her yearly compensation would be $45,000;

    b. Her hourly wage rate and annual amount is $11.75 - $13.00 / $38,000 - $40,000; and

    c. Other benefits included 2 weeks of vacation, 1 year of housing and vehicle support, and holiday over-time pay.

468. The offer letter was signed by Defendant Lee (listed on the letter as "Paul Lee").

469. Ms. Olan signed the offer letter on the same day, indicating: "I hereby fully understand and agree to the Terms and Conditions of the Job Offer above and

83

gladly accept it…"

470.    SPJ continued to coordinate Ms. Olan's employment with Allswell by providing information on her behalf to the United States Consulate in Mexico to obtain a TN visa.

471.    In an effort to get Ms. Olan a TN visa so she could come to work in the United States, Allswell prepared a required support letter pursuant to 8 C.F.R. 214.6(d)(3), which was submitted to the consulate as part of Ms. Olan's TN visa application.

472.    SPJ provided the support letter to Ms. Olan.

473.    The support letter SPJ provided to Ms. Olan was (a) dated September 3, 2021, (b) addressed to the United States Consulate in Merida, Mexico,  (c) on Allswell letterhead, and (d) signed by Allswell's President, Seungbae Park.

474.    The support letter outlined, among other things, that Allswell had offered a Production Engineer position to Ms. Olan.

475.    The support letter further explained that as a Production Engineer, Ms. Olan would be assigned to work "in 7777 Kia Parkway, West Point, Georgia 31833," at the "Kia Motors Manufacturing – Georgia Plant".

476.    The support letter indicated that the Production Engineer position was "specialized in nature and falls within the schedule of permitted TN occupations –

Engineer – authorized by NAFTA."

477.   The support letter further stated:

As a Production Engineer, she will utilize her academic background in <u>Production Engineering</u> and professional experiences in the field of Operations Engineering to support the company in the development, analysis, improvement, and implementation of process definition and control procedures, management, of the flow of materials and equipment specifications, and process yield capabilities to help improve the efficiencies. Her main job duties will include the following:

- Develop, evaluate, and improve operations processes; Utilize a sequential flow pattern in the process; Minimize backtracking of work in the process; Implement a predictable process.
- Analyze, develop, and optimize workflows within the production process across all departments to improve efficiency throughout the company.
- Review KPI monitoring systems to determine ways to improve company operations and eliminate waste.
- Create an analytical process that justifies new business opportunities while helping sales team develop an optimized process to secure new business opportunities.
- Develop best practices, routines and innovate new solutions to improve production rates and overall part quality.
- Work closely with the Quality team to create, improve, and develop standardized work instructions.
- Apply engineering, science, and business skills to carry out core functions in the fabrication and assembly of products.
- Develop & implement activity plans for projects and rotate PDCA (Plan-Do-Check-Action) including budget, spec., schedule, management, start-up, evaluations, and presentations.
- Locates sources of problems by observing mechanical devices in operation.

478.   The support letter further explained that Ms. Olan was qualified for TN status as a Production Engineer for the following reasons:

- Ms. Veronica Olan Castillo is a Mexican citizen and is well qualified for the job position offered;
- The employment offered to Ms. Veronica Olan Castillo is at a specialized level;
- Ms. Veronica Olan Castillo possesses the requisite professional qualifications to perform the duties at a professional level;
- The position offered is temporary, for up to three years in duration; and
- Ms. Veronica Olan Castillo intends to return to Mexico at the completion of the proposed assignment.

479.   The support letter outlined that Allswell proposed to hire Ms. Olan for a temporary period of three years with a compensation of "$45,000 per year plus a standard package of employee benefits including housing and transportation."

480.   Although unknown to Ms. Olan, the job offer and the Support Letter to secure the TN visa were not true.

481.   Unknown to Ms. Olan, she was the victim of a scheme to secure her employment for manual (non-technical) production line work at Kia.

482.   On or about September 8, 2021, Ms. Olan travelled to the U.S. Consulate in Merida, Mexico for an interview to obtain a TN visa.

483.   She incurred $400 in travel and food costs, which were not reimbursed.

484.   She paid approximately $160 to apply for the TN visa. This cost was not reimbursed.

485.   The scheme by Defendants to fraudulently secure a TN visa for Ms. Olan was successful; and a TN visa was granted for her to work on a temporary basis in the United States at the Hyundai/Kia plant in West Point, Georgia.

486.   In reliance on the promises made by SPJ and Allswell concerning the job promised to her and her eligibility for that job under U.S. law, Ms. Olan moved from Mexico to Georgia, near her place of work in West Point, Georgia, in early October 2021.

487.   In mid-October 2021, Ms. Olan started working on the Kia production line at the Hyundai/Kia plant in West Point, Georgia.

488.   When Ms. Olan began the job, she had already expended significant costs and expenses to travel to the United States, and she had foregone other employment opportunities.

489.   Ms. Olan immediately learned that the job she had been promised did not exist (or at least did not exist for her).  Rather than perform technical services as promised by SPJ and Allswell and as required for a TN visa, Ms. Olan was required to perform manual labor on the Kia production line.

490.   The production line work required no technical skill and involved repetitive tasks, such as tightening screws on car doors and putting antifreeze in cars.

491.   During Ms. Olan's employment, she was paid $12.50 per hour.

492.   Ms. Olan received supervision and direction regarding how to perform her job from both Kia and Allswell supervisors during the course of her joint employment with these Defendants. Kia and Allswell supervisors controlled her job duties and directed her on how to perform the assigned manual labor tasks.

493.   In addition to the non-technical, repetitive, production line manual labor, which was a different position than promised, Ms. Olan was required to work substantial overtime.

494.    She worked shifts that lasted as long as twelve hours. For example, during the two-week pay period of March 14, 2022 to March 27, 2022, Ms. Olan worked 126 hours.

495.    Defendants Allswell and Kia made it clear to Ms. Olan that overtime was mandatory.

496.    Ms. Olan spent each of her long shifts using her hands in repetitive motions.

497.    As a result, Ms. Olan's back, hands, and feet hurt, and she was constantly exhausted.

498.    Allswell and Kia discriminated against Ms. Olan during her employment.

499.    Ms. Olan's supervisors and co-workers frequently harassed her and applied work rules to her that were not applied to workers who were not Hispanic and Mexican.

500.    Further, while Ms. Olan was required to work overtime under threat of termination and deportation, other Kia employees who were U.S. citizens or nationals, non-Mexican, and non-Hispanic were only required to work 40 hours per week without threat of termination.

501.    While Ms. Olan was paid $12.50 per hour, other Kia employees who

were U.S. citizens or nationals, non-Mexican, and non-Hispanic were paid significantly more for the same job duties and with less experience and qualifications.

502.  Ms. Olan complained on multiple occasions to her supervisors about her mistreatment.

503.  On May 6, 2022, Ms. Olan was terminated in retaliation for complaining about her wages and working conditions.

504.  Allswell paid Ms. Olan's wages "off the books" from when she started working in October 2021 until mid-January 2022.

505.  Allswell did not take Social Security or income tax withholdings from Ms. Olan's wages during this period.

506.  Allswell fraudulently and willfully did not report this portion Ms. Olan's earnings to the IRS in its quarterly and annual returns.

507.  In mid-January 2022, Allswell started taking income tax and Social Security withholdings from Ms. Olan's wages, but Allswell did not associate these withholdings with Ms. Olan's Social Security number.

508.  Allswell fraudulently and willfully did not report Ms. Olan's earnings to the IRS in its quarterly and annual returns, even after Allswell started making income tax and Social Security withholdings.

**Plaintiff Aaron Hernan Perez Salazar**

509.   Mr. Perez was born and raised in Mexico and is a citizen of Mexico.

510.   Mr. Perez is a skilled engineer.

511.   In Mexico, Mr. Perez attended the Universidad Autónoma Metropolitana to become an electronic engineer.

512.   Mr. Perez posted his CV online, hoping to be recruited for a job in the United States to use his professional engineering skills and earn a better living.

513.   In response to Mr. Perez' CV posting, TESS contacted him to recruit him for an engineering position, and Mr. Perez applied.

514.   On April 12, 2022, Tae H. Kim, the General Manager of JKL, wrote to Mr. Perez, offering him the job of "Logistics Engineer in our Logistics Department." (Exh. 25).

515.   The offer letter provided, among other things, the following terms and conditions for Mr. Perez' employment.

   a.  His "[c]ontract term" would be "for 3 years, the full duration of TN visa."

   b.  His "[s]tarting annual salary" would be "$35,000."

   c.  He would also receive several "salary benefits," including:

     i.  One month free rent in an employer-provided apartment

with two to three people per room, after which he could

pay $104.55 in "Monthly rent," "deducted every month";

ii. "Optional transportation . . . for a fee";

iii. "Company Health Insurance (eligible after 90 days of employment)" with a "weekly rate" of $440;

iv. A "$300 Sign On Bonus (must complete 90 days of employment)";

v. "3 Paid Holidays"; and

vi. An "[a]nnual Raise upon satisfactory performance & attendance."

516.   Tae H. Kim, JKL's General Manager, signed the April 12, 2022 offer letter.

517.   The letter instructed Mr. Perez to "indicate [his] acceptance of [JKL's] offer by signing below and returning one copy of the letter[.]" Mr. Perez signed JKL's offer letter on April 18, 2022, and returned it to TESS.

518.   The April 12, 2022, offer letter from JKL also included a "Conformity Agreement."

519.   The Conformity Agreement stated that Mr. Perez "express [sic] agreement and acceptance of the terms and conditions of the information below that

has been provided by TESS LLC regarding the Job Offer received by Job Knowledge LLC (JKL) (Name of the Company who hires you), nevertheless this document is not a contract with TESS LLC or any other company. TESS LLC is limited to being only a recruiting company acting as an intermediary."

520.   The Conformity Agreement also provided the following conditions:

    a.   Mr. Perez's annual wage would be "$35,000 USD dollars before taxes."

    b.   Job Knowledge LLC would offer "300 Sign-on bonus" and "1 Month Housing."

    c.   Mr. Perez would "cover" "by [him]self" "Personal expenses," including "Visa TN expenses (160 Dollars for the embassy" and "moving expenses."

521.   The Conformity Agreement stated that Mr. Perez would "agree to remain in the Job Knowledge LLC company that is hiring me, for a minimum of six months from the first day of work."

522.   Mr. Perez also signed the Conformity Agreement—which was attached to the offer letter—on April 18, 2022, indicating he had "READ THIS AGREEMENT, with the prior declaration of knowing the scope and content of each and every one of its points[.]"

523.    After Mr. Perez signed the offer letter and Conformity Agreement, TESS coordinated Mr. Perez's employment with JKL by providing him with information and directives relating to his visa application to the United States Embassy in Mexico. (Exh. 26).

524.    In an effort to get Mr. Perez a TN visa so he could come to work in the United States at Hyundai and Kia, JKL prepared a TN visa support letter pursuant to 8 C.F.R. 214.6(D)(3) dated May 6, 2022, which was addressed to the United States Embassy in Mexico.  The support letter was on JKL letterhead and signed by JKL's General Manager Tae Kim. (Exh.27).

525.    The support letter to the U.S. Embassy outlined, among other things, that JKL "wishe[d] to temporarily employ Mr. Aaron Hernan Perez Salazar for up to three (3) years in the NAFTA occupation category of Professional Engineer (as listed in NAFTA Chapter 16, Annex 1603)."

526.    JKL's letter to the U.S. Embassy stated that "[t]he position offered is professional and specialized in nature and falls within the schedule of permitted TN occupations - Engineer - authorized by NAFTA."

527.    The letter further explained, "[a]s an Electronics Engineer, Mr. Aaron Hernan Perez Salazar will utilize his academic background in Electronics Engineering and his professional background to work closely with fellow engineers,

technicians and machinists to eliminate wastefulness in production processes and devise efficient systems that integrate workers, machines, materials, information, as well as auxiliary systems to support the overall architecture of various designs of JKL."

528.   The letter concluded that Mr. Perez was "well-qualified to fill the position of an Electronics Engineer" because of his education, training, and professional experience. Specifically, the letter noted, "[i]n 2015, he obtained a bachelor's degree in The Universidad Autonoma Metropolitana in Mexico" and "[i]n addition, he has 7 years of engineering experience in companies related with automotive-engineering industry and JKL processes, beside [sic] an excellent academic performance."

529.   JKL further detailed that Mr. Perez's job duties would include:

- Develop electronic schematics & panel design and control system design solutions based on engineering principles and prototypes for automobile industrial applications;
- Analyze project requirements and perform technical calculations supporting design including electrical & electronic requirements, robotic safety standards;
- Evaluate electrical & electronic control systems, prototypes and proposals and recommend design modifications to eliminate causes of malfunctions or changes in system requirements;
- Develop and maintain procedures for maintaining complex automated test equipment, new capability development, and process improvement;
- Make adjustments to control system parameters to bring system into specifications or to improve performance;
- Inspect electronic equipment systems to ensure conformance to specifications, safety standards, and applicable codes and regulations;
- Plan and develop applications and modifications for electronic properties used in parts and systems to improve technical performance; and
- Manage manufacturing documentation required for product manufacturing, i.e., revise drawing, accurate work instructions and workmanship standards and process procedures.

530.   Although unknown to Mr. Perez, the position description provided in the job offer and support letter to secure the TN visa was false.

531.   Unknown to Mr. Perez, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at Hyundai and Kia.

532.   Mr. Perez traveled to the U.S. Embassy in Mexico City for an interview to obtain a TN visa.

533.   Mr. Perez incurred mileage, lodging, and food costs which were not reimbursed, to drive from Mexico City, Mexico, to Atlanta, Georgia; more than 1,200 miles.

534.   Mr. Perez paid $160 to apply for the TN visa. This cost was also not reimbursed.

535.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Perez was successful; in reliance on TESS's and JKL's misrepresentations, the U.S. government issued a TN visa to Mr. Perez to work on a temporary basis in the United States at Hyundai and Kia in West Point, Georgia.

536.   In reliance on the promises made by TESS and JKL concerning the job promised to him and his eligibility for that job under U.S. law, Mr. Perez moved from Mexico to the United States to begin work at the Hyundai and Kia car manufacturing plant in West Point.

537.   At the end of August 2022, Mr. Perez started working for Hyundai at the Hyundai/Kia plant.

538.   When Mr. Perez began the job, he had already expended significant costs and expenses to travel to the United States, and he had foregone other employment opportunities.

539.   Mr. Perez immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform engineering services as promised by JKL and as required for a TN visa, Mr. Perez was required to perform manual labor on a production line.

540.   The production line work required no engineering skill and involved the repetitive production line work, including carrying heavy objects, sorting parts, and handing parts to a technician.

541.   During Mr. Perez's employment, he was paid $12 per hour.

542.   Mr. Perez was subjected to two, $300 "Sign-up Bonus Advance Deduction[s]" to his pay.

543.   In at least the work week ending September 10, 2022, this "sign-up bonus" deduction reduced Mr. Perez's effective hourly pay far below $7.25 per hour.

544.   Mr. Perez was forced to work on the line approximately 15 hours or more each week without pay.

545.    Additionally, Mr. Perez was required to wait every day at the entry gate to the Hyundai/Kia plant because JKL did not provide him with an identification badge, and he had to enter the plant as a "visitor." He was not paid for this waiting time, which totaled approximately three hours and thirty minutes each week.

546.    Mr. Perez observed people in Hyundai and Kia uniforms in the plant, who appeared to be monitoring the work.

547.    A few times, a group of supervisors with Hyundai and Kia logos on their uniforms corrected Mr. Perez' work.

548.    JKL supervisors monitored Mr. Perez' attendance, communicated his schedule in the plant, and provided him with paychecks.

549.    Mr. Perez was required to work overtime and worked a total of approximately 75-80 total hours per week.

550.    Ultimately, Mr. Perez quit after about one month of work because Defendants JKL forced him to perform manual labor instead of the engineering job that Defendants TESS and JKL had promised and because he was required to work grueling, unsustainable hours.

### Employment Discrimination

551.    Other employees of Defendants Hyundai and Kia who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic, likewise do not

97

perform technical work but instead perform manual labor like all Plaintiffs.

552.   All Plaintiffs earn or earned substantially less per hour than employees who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic who are employees of Defendants Hyundai and Kia.

553.   Employees of Hyundai and Kia who are or were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic are not required to work more than 40 hours per week when performing the same or a similar job.

554.   For example, James [last name unknown], an African American employee of Hyundai, worked for Hyundai performing the same work as Mr. Aquino and Mr. Cruz. He only has a high school diploma, yet he earns $24 per hour. Hyundai does not require him to work more than 40 hours per week.

555.   An African American female in her 40's, who is also an employee of Hyundai, performed the same work as Mr. Aquino and Mr. Cruz, and she earned $22 per hour. She only has a high school diploma. Hyundai does not require that she work more than 40 hours per week.

556.   Plaintiffs have spoken with other co-workers at Hyundai and Kia about their compensation and have learned that those employees, who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic, and who were performing similar production line labor, earn hourly wages ranging from a dollar more per hour

to nearly double the Plaintiffs' wages, with no required overtime.

557.  Plaintiffs also have learned that employees of Hyundai and Kia who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic who perform the same work as Plaintiffs are not required to hold college degrees.

558.  Defendants Hyundai and Kia have a pattern and practice of paying employees who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic higher wages than employees who were non-U.S. citizens, Hispanic, and of Mexican national origin

## RICO VIOLATIONS

### *RICO Enterprises*

559.  Plaintiffs plead the existence of RICO Enterprise I, II, and III, as set forth below.

560.  At all relevant times, the RICO Enterprises existed for the common purpose of securing cheap manual labor to work at the Hyundai/Kia plant and to profit from such labor.

561.  At all relevant times, the RICO Enterprises were engaged in, or their activities affected, interstate and/or foreign commerce. *See* 18 U.S.C. 1962(c).

562.  Enterprise III is a single enterprise led by Hyundai and Kia that combines Enterprises I and II.

## Enterprise I

563.   Defendants Hyundai, Kia, SPJ, and Allswell were an enterprise ("RICO Enterprise I") within the meaning of RICO in that they were associated in fact although not a legal entity. *Id.*

564.   RICO Enterprise I is an ongoing organization with a framework, either formal or informal, for carrying out its common purpose.

565.   The association comprising RICO Enterprise I began as early as November 2020 and was used to defraud Plaintiffs, the U.S. government, and many other foreign workers recruited from Mexico to work for Hyundai and Kia.

### *Association-in-Fact*

566.   RICO Enterprise I members associated with each other for the common purpose of recruiting Mexican engineers and technicians for and employing Mexican engineers and technicians on Hyundai's and Kia's production line.

567.   Hyundai and Kia agreed with SPJ and Allswell that they would recruit and employ foreign workers to work as laborers on Hyundai's and Kia's production line at the Hyundai/Kia plant.

568.   SPJ and Allswell knowingly agreed with Hyundai and Kia to post fraudulent announcements for employment at the Hyundai/Kia plant as engineers or in other positions with education and skill requirements necessary to make foreign

workers qualified for TN visas.

569.  In furtherance of the scheme, Hyundai and Kia provided detailed information relating operations at the Hyundai/Kia plant to use during recruitment and to include in the TN visa support letters.

570.  Hyundai and Kia agreed to this scheme as evidenced by its hiring the Hyundai Claimants and the Kia Claimants, respectively, once they secured a TN visa and jointly employing them with Allswell. The foregoing activities constitute mail and/or wire fraud, violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343, and damaged Plaintiffs and similarly situated employees.

571.  Hyundai's and Kia's agreement to this scheme also is evidenced by their knowledge of the TN visa requirements, knowledge that foreign workers must have a visa and work authorization, and their review of TN visa documents with full knowledge that the foreign workers were not performing jobs that qualified for the TN visa.

572.  Defendants in Enterprise I agreed to make false representations, through Enterprise I, to Plaintiffs, among many other similarly situated Mexican workers, that the jobs available at Hyundai and Kia required the education and skill that would make them eligible for TN visas and entice them to apply, while knowing that these jobs did not exist and that Plaintiffs and others would be working manual

labor production assembly line jobs.

573.   Hyundai and Kia allowed Allswell employees to work at their plants, jointly trained and supervised the Hyundai Claimants and the Kia Claimants, respectively, during their employment, and provided Plaintiffs (with the exception of Plaintiff Perez) and Allswell employees identification badges or visitor badges to identify them and allow them access to the Hyundai/Kia plant.

574.   SPJ and Allswell, acting as recruiters for Hyundai and Kia, made these misrepresentations and committed overt acts of collecting information, causing the mail/wires to be used to transmit and in furtherance of the false and fraudulent statements to Plaintiffs and others, facilitating consular interviews for Plaintiffs, preparing Plaintiffs for their consular interviews (including preparation of the types of questions they would be asked, and the answers to give), and providing other information to Hyundai and Kia.

575.   Acting on the basis of fraudulent misrepresentations made by Allswell, and SPJ, and with the plan and intention of using the same to defraud the U.S. Government in connection with TN visa applications, Plaintiffs and others were offered jobs at Hyundai and/or Kia as outlined in the Support Letters signed by Allswell.

576.   Yet, all the Defendants in Enterprise I knew that TN visas would not

and could not be granted for workers who lacked the required education or professional experience to perform the manual labor positions that Hyundai and Kia wanted filled.

577.  In a recorded conversation in April 2021, during a meeting with TN visa workers, Defendant Lee, who had signed support letters for many of Defendants' TN visa workers, conceded engineers make "20, 25, 30 dollars an hour" but that, if they wanted to be placed in an engineer position, they first needed to build up their skills doing manual labor at the plant.

578.  He stated: "I can move people after a year to an engineer. For them to get an engineer, oh where did you work? Mobis? What did you do? [Inaudible]. So go to school, get English on Saturday and Sunday. If you want to be an engineer, you'll have three to four guys working for you right? […] I can get $40 per hour and I can give you $25 per hour." He further stated: "You need to build up your resume. Who is going to hire you? You need to build a skill. […] Build up your resume then you can go to the next level."

579.  Mr. Lee further admitted that he could go to jail for the working conditions the TN visa workers were experiencing.

580.  Knowing that TN visas would be granted only for professional foreign workers for professional-level job positions, all of the Defendants in Enterprise I

agreed that SPJ, and Allswell (1) would recruit high skilled Mexican and Hispanic engineers and technicians for Hyundai and Kia who satisfied the TN visa requirements; and (2) would misrepresent the production line labor positions (which did not qualify for TN visas) as professional-level engineering and technician job positions (which did qualify for TN visas).

581.   The plan continued with SPJ vetting the Plaintiffs and other candidates, obtaining their resumes, technical or bachelor's degrees, and checking their educational background and engineering and/or technician skills before offering jobs to each of them.

582.   The plan continued with SPJ, during the interview, confirming that Plaintiffs and other foreign workers were in fact highly skilled and highly educated, and concealing the nature of the job available for Plaintiffs and other foreign workers.

583.   The plan continued with SPJ providing fraudulent job offers to Plaintiffs and other foreign workers on behalf of Allswell and Hyundai and/or Kia that mispresented the job positions, duties, and pay so that the job positions met the requirements for TN visas and so that Plaintiffs and other foreign workers would accept the job positions and apply for TN visas, to their detriment.

584.   The plan continued with Allswell preparing, and SPJ providing,

fraudulent TN visa Support Letters to Plaintiffs and other foreign workers upon the acceptance of the job offers.

585.   The plan continued with SPJ providing the Plaintiffs they recruited and other workers directions on how to prepare for and answer questions during their consular interviews so that they could obtain TN visas.

586.   At the time that SPJ and Allswell provided the fraudulent TN visa Support Letters to the Plaintiffs they recruited to work for Hyundai and Allswell, and other foreign workers, offering them an engineer or technician position, all the Defendants in Enterprise I knew that the letters included false descriptions of the job positions available for those Plaintiffs and other workers, false descriptions of the pay to those Plaintiffs and other foreign workers, and other false information.

587.   The fraudulent TN visa Support Letters were directed to the United States consulate and were part of these Defendants' scheme, through RICO Enterprise I, to commit visa fraud, mail and wire fraud, and fraud in foreign labor contracting.

### *Participation in the Operation and Management of the Enterprise's Affairs*

588.   Hyundai, Kia, and Allswell directed SPJ to post job announcements for positions of employment at the Hyundai/Kia plant which would, by reason of the education, experience, and skill required, qualify the successful applicant to obtain

a TN visa.

589.   Allswell and SPJ developed a strategy to recruit foreign workers who may be qualified for the TN visa, including by identifying appropriate websites and other locations in which to post announcements for jobs at Hyundai and Kia that would be seen and responded to by qualified Mexican nationals.

590.   SPJ then executed that strategy, communicating with Plaintiffs and other potential targets of the fraud scheme to screen them for employment with Allswell, Hyundai, and Kia, checking their educational background and engineering or technician qualifications, and preparing them for their consular interviews.

591.   SPJ accepted the directives of Hyundai, Kia, and Allswell and provided information concerning the positions at Hyundai and Kia to individuals who responded to the announcements they posted.

592.   SPJ made false statements and fraudulent misrepresentations to the candidates during their job interviews.

593.   SPJ and Allswell decided which candidates to hire. Then, SPJ directed Allswell to provide those candidates with job offers at Hyundai and/or Kia for jobs that did not exist.

594.   Allswell prepared Support Letters for hired candidates, with the approval of Hyundai and Kia, for employment at the Hyundai/Kia plant.

595.   SPJ provided those Support Letters to Plaintiffs. The Support Letters offered each Plaintiff a job at Hyundai or Kia, with the exception of Arellano, who was offered a job at another auto parts manufacturer in his Support Letter but was ultimately placed to work at Hyundai upon his arrival in the United States.

596.   SPJ and Allswell provided the fraudulent Support Letters to the U.S. Consulate on behalf their respective companies, Hyundai, Kia, and the hired candidates.

### *Pattern of Continuous Coordinated Conduct*

597.   As shown by the fact that Plaintiff Zapata viewed a LinkedIn advertisement posted by SPJ for an engineering job as early as November 2020 and was subsequently placed at a TN-visa qualifying jobs at Hyundai by Allswell and SPJ, the pattern of continuous coordinated conduct by the RICO Enterprise began at least as early as November 2020.

598.   Defendants continued to recruit Mexican nationals to work at Hyundai and Kia with TN visas at least until the time of the filing of the original Complaint.

599.   SPJ's Facebook pages continue to post on social media to recruit TN visa applicants for positions SPJ claims are engineering jobs.

600.   For example, on July 15, 2022, SPJ posted pictures on Facebook at the Hyundai/Kia plant and wrote: "The SPJ team visiting one of the most recognized

companies in the automotive industry. Looking for new opportunities."

601.    Hyundai, Kia, and Allswell continue their illegal scheme by continuing to employ workers under the TN visa program that are highly skilled but employed in manual labor low-skilled positions and at lower pay than to the American workers. All Defendants in Enterprise I continue to participate in and profit from this illegal scheme.

602.    Defendants in Enterprise I recruited hundreds of foreign workers under the TN visa program through this scheme to advertise false job openings, make false job offers, submit false TN visa Support letters, induce the foreign workers to come to the U.S. for non-existent jobs, and require the foreign workers to work in manual labor positions for lower pay, discriminatory pay, and pay that violated the FLSA.

603.    The TN visa is tied to the associated employer for the duration of the TN visa period, unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers. 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker). Thus, the continued employment of Plaintiff TN visa holders and others by Hyundai, Kia, and Allswell threatens future fraud against the U.S. Government when these visas are renewed at the end of the three-year visa period.

*Racketeering Activity through Numerous Predicate Acts of Fraud*

604.   As part of a scheme or artifice to defraud, Defendants in Enterprise I caused to be transmitted by mail and/or wires the job announcements used to recruit candidates like Plaintiffs for employment with Hyundai and/or Kia.

605.   The job announcements posted by Defendants in Enterprise I contained material misrepresentations upon which the Plaintiffs who viewed them and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343.

606.   As part of a scheme or artifice to defraud, Defendants in Enterprise I caused to be transmitted by mail and/or wires the offer letters which offered employment with Hyundai or Kia to the Plaintiffs who were subjected jointly employed by them and Allswell, and others.

607.   The offer letter contained material misrepresentations upon which Plaintiffs and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343.

608.   As part of a scheme or artifice to defraud, Defendants in Enterprise I caused to be transmitted by mail and/or wires statements of fact to the U.S. Government regarding the jobs to be performed by Plaintiffs and others.

609.   Defendants in Enterprise I made material misrepresentations in the statements of fact submitted to the U.S. Government, and the U.S. Government

relied on those statements in issuing TN visas to Plaintiffs and others, constituting violations of 18 U.S.C. § 1341 and/or §1343 and §1546.

610.   As part of a scheme or artifice to defraud, Defendants SPJ and Allswell used materially false or fraudulent representations or promises regarding employment offered to Plaintiffs and others knowingly and with the intent to defraud, in violation of 18 U.S.C. § 1351.

611.   As part of a scheme or artifice to defraud, Defendants in Enterprise I used false attestations to secure work authorization for Plaintiffs and others and/or knowingly subscribed as true false statements concerning the jobs to be performed by Plaintiffs and others, which were material facts in an application, affidavit, or other document submitted for use in immigration proceedings to obtain a visa, constituting a violation of 18 U.S.C. § 1546.

612.   Defendants in Enterprise I each knowingly and with the intent to defraud recruited, solicited, and hired Plaintiffs and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

613.   Hyundai and Kia caused Allswell and SPJ to knowingly and with the intent to defraud recruit, solicit, and hire Plaintiffs and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations

110

and promises regarding the employment, in violation of 18 U.S.C. § 1351.

614.   Defendants used false attestations and provided fraudulent Visa Support Letters to the United States government for purposes of committing visa fraud in violation of 18 U.S.C. § 1546; *see e.g., U.S. v. Wu*, 20-10273, 2022 WL 4461376, at *3 (9th Cir. Sept. 26, 2022).

### *Plaintiffs' Pecuniary Injuries Directly and Proximately Caused by the Pattern of Racketeering Activity*

615.   Defendants knowingly and through fraudulent conduct induced Plaintiffs and other foreign workers to unknowingly pay for and apply for a fraudulent TN visa, to travel to the United States for a job that did not exist, and to accept employment at terms that were less than promised.

616.   Hyundai and Allswell did not pay the Hyundai Claimants and other foreign workers the salary promised in the job offers and Support Letter provided to the consulate.

617.   Kia and Allswell did not pay the Kia Claimants and other foreign workers the salary promised in the job offers and Support Letter provided to the consulate.

618.   Plaintiffs and other TN visa foreign workers suffered pecuniary losses that were directly and proximately caused by the fraudulent job postings for positions with Hyundai or Kia, the application and related information provided to

them by Defendants, the offer letter provided to them by Defendant SPJ and Allswell, and the Support Letter provided to them and the U.S. Consulate by Defendants and the resulting TN visas issued to them, including but not limited to:

    a.    Travel costs to and from the U.S. consulate for the mandated TN visa interview;

    b.    U.S. Government visa processing fees of $160 per visa;

    c.    Unreimbursed expenses for travel to the U.S. to work for Hyundai and/or Kia and return travel to Mexico;

    d.    Costs to purchase essential furniture and household goods upon arrival at housing provided by Defendants; and

    e.    Lost wages in the form of the difference between the wages promised and the lower wages actually paid.

619.   These pecuniary losses and others would not have been suffered but for the material misrepresentations made to Plaintiffs and others as part of the scheme to defraud them and the U.S. Government to secure recruit Plaintiffs and others for jobs that did not exist.

### *RICO Enterprise II*

620.   Defendants Hyundai, Kia, JKL, and TESS were an enterprise ("RICO Enterprise II") within the meaning of RICO in that they were associated in fact

although not a legal entity. *See* 18 U.S.C. § 1961(4).

### *Association-in-Fact*

621.   RICO Enterprise II was an ongoing organization with a framework, either formal or informal, for carrying out its common purpose.

622.   The association comprising RICO Enterprise II began as early as March 31, 2022 and has resulted in fraud upon Plaintiff Perez and dozens of other foreign workers recruited from Mexico to work for Hyundai and/or Kia. Hyundai and Kia agreed with JKL and TESS that JKL and TESS would recruit and employ foreign workers to work as laborers on Hyundai's and Kia's production line.

623.   TESS knowingly agreed with Hyundai, Kia, and JKL, to post fraudulent announcements for employment at the Hyundai/Kia plant as engineers or in other positions with education and skill requirements necessary to make foreign workers qualified for TN visas.

624.   In furtherance of the scheme, Hyundai and Kia provided detailed information relating to operations at the Hyundai/Kia plant to use during recruitment and to include in the TN visa support letters.

625.   Hyundai and Kia agreed to this scheme as evidenced by its hiring the Hyundai Claimants and the Kia Claimants, respectively, once they secured a TN visa and jointly employing them with JKL. The foregoing activities constitute mail and/or

113

wire fraud, violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343, and damaged Plaintiffs and similarly situated employees.

626.   Hyundai's and Kia's agreement to this scheme also is evidenced by their knowledge of the TN visa requirements, knowledge that foreign workers must have a visa and work authorization, and their review of TN visa documents with full knowledge that the foreign workers were not performing jobs that qualified for the TN visa.

627.   Defendants in Enterprise II agreed to make false representations to Plaintiffs, among many other similarly situated Mexican workers, that the jobs available at Hyundai and Kia required the education and skill that would make them eligible for TN visas and entice them to apply, while knowing that these jobs did not exist and that Plaintiffs and others would be working manual labor production assembly line jobs. Indeed, Hyundai and Kia allowed JKL employees to work at their plants, allowed JKL to house its main office inside the Mobis Georgia plant, jointly trained and supervised the Hyundai Claimants and the Kia Claimants, respectively, during their employment, and allowed Plaintiffs access to the property.

628.   TESS and JKL, acting as recruiters for Hyundai and Kia, made these misrepresentations and took overt acts of collecting information, causing the mail/wires to be used to transmit and in furtherance of false and fraudulent

statements to Plaintiffs and others, facilitating consular interviews for Plaintiffs, preparing Plaintiffs for their consular interviews (including preparation of the types of questions they would be asked, and the answers to give), and providing other information to Hyundai and Kia.

629.   Acting on the basis of fraudulent misrepresentations made by TESS and JKL, and with the plan and intention of using the same to defraud the U.S. Government in connection with TN visa applications, Plaintiffs and others were offered jobs at Hyundai or Kia as outlined in the Support Letters signed by JKL.

630.   Yet all the Defendants in Enterprise II knew that TN visas would not and could not be granted for workers who lacked the required education or professional experience to perform the manual labor positions that Hyundai and Kia wanted filled.

631.   Knowing that TN visas would be granted only for professional foreign workers for professional-level job positions, all of the Defendants in Enterprise II agreed that TESS, and JKL (1) would recruit high skilled Mexican and Hispanic engineers and technicians for Hyundai and Kia who satisfied the TN visa requirements; and (2) would misrepresent the production line labor positions (which did not qualify for TN visas) as professional-level engineering and technician job positions (which did qualify for TN visas).

632.   The plan continued with TESS vetting the Plaintiffs and other candidates, obtaining their resumes, technical or bachelor's degrees, and checking their educational background and engineering and/or technician skills before offering jobs to each of them.

633.   The plan continued with TESS, during the interview, confirming that Plaintiffs and other foreign workers were in fact highly skilled and highly educated, and concealing the nature of the job available for Plaintiffs and other foreign workers.

634.   The plan continued with TESS providing fraudulent job offers to Plaintiffs and other foreign workers on behalf of JKL and Hyundai and/or Kia that mispresented the job positions, duties, and pay so that the job positions met the requirements for TN visas and so that Plaintiffs and other foreign workers would accept the job positions and apply for TN visas, to their detriment.

635.   The plan continued with JKL preparing, and TESS providing, fraudulent TN visa Support Letters to Plaintiffs and other foreign workers upon the acceptance of the job offers.

636.   The plan continued with TESS providing Plaintiff Perez and other workers with directions on how to prepare for and answer questions during their consular interviews so that they could obtain TN visas.

116

637.   At the time that TESS and JKL provided the fraudulent TN visa Support Letters to Plaintiffs and other foreign workers, offering an engineer or technician position, Defendants knew that the letters included false descriptions of the job positions available for Plaintiffs and other workers, false descriptions of the pay to Plaintiffs and other foreign workers, and other false information.

638.   The fraudulent TN visa Support Letters were directed to the United States Consulate and were part of Defendants' scheme, through RICO Enterprise II, to commit visa fraud, mail and wire fraud, and fraud in foreign labor contracting.

### Participation in the Operation and Management of the Enterprise's Affairs

639.   Hyundai, Kia, and JKL directed TESS to post job announcements for positions of employment at the Hyundai and/or Kia plant which would, by reason of the education, experience, and skill required, qualify the successful applicant to obtain a TN visa.

640.   TESS and JKL developed a strategy to recruit foreign workers who may be qualified for the TN visa, including by identifying appropriate websites and other locations in which to post announcements for jobs at Hyundai and Kia that would be seen and responded to by qualified Mexican nationals.

641.   TESS then executed that strategy, communicating with Plaintiffs and other potential targets of the fraud scheme to screen them for employment with JKL,

Hyundai, and Kia, checking their educational background and engineering or technician qualifications, and preparing them for their consular interviews.

642.   TESS accepted the directives of Hyundai, Kia, and JKL, and provided information concerning the positions at Hyundai and Kia to individuals who responded to the announcements they posted.

643.   TESS made false statements and fraudulent misrepresentations to the candidates during their job interviews.

644.   TESS and JKL decided which candidates to hire. Then, TESS directed JKL, Hyundai, or Kia to provide those candidates with job offers for jobs that did not exist.

645.   JKL then prepared Support Letters for hired candidates, with the approval of Hyundai and/or Kia for employment at their plants.

646.   TESS provided those Support Letters to Plaintiff Perez and similarly situated workers.

647.   TESS and JKL provided the fraudulent Support Letter to the U.S. Consulate on behalf of their respective companies, Hyundai, Kia, and the hired candidates.

### Pattern of Continuous Coordinated Conduct

648.   Defendant TESS emailed Plaintiff Perez about a job opportunity in the

United States on March 31, 2022, in response to a CV Mr. Perez posted online. TESS later interviewed him for an engineering job, and he was then placed in a TN-visa qualifying job at Hyundai, where he worked for Defendants JKL, Kia, and Hyundai.

649.   On information and belief, TESS recruited Mexican nationals to work at Hyundai and Kia with TN visas.

650.   TESS continues to post on Facebook and other social media in an effort to recruit TN visa applicants for positions TESS claims are engineering jobs.

651.   For example, on November 15, 2022, TESS posted a job fair announcement on Facebook claiming that it was hiring "Mexican professionals" for work with a "TN visa" and had vacancies for "engineers and technicians."[15]

652.   Hyundai, Kia, and JKL continue their illegal scheme by continuing to employ workers under the TN visa program who are highly skilled but employed in manual labor low-skilled positions and at lower pay than to the American workers. All Defendants in Enterprise II continue to participate in and profit from this illegal scheme.

---

[15] *See* https://www.facebook.com/TESS.LLC.USA/posts/pfbid037euD2 LiyVRLgGG3pF5Rxhj9JjR1wJppevpxuXucRnhGv2LfwXwdTu4ZZsmuauYxCl? __cft__[0]=AZWlpL0nlyYw2_jpQX3-4G_XgevQyxL56IbwHMUIJVTv_4H q68aJgq_3gfCDGDgUHKDmh9wljoclq6YM6WJDNpOuVh0UZvarG_Dz1u96B3 iCFZKAIKJQMbMHyXFfr_fvDc-U2rpmXKqsaXt5OAABw09x9usWHqJ5p Myiy7l_P49nK4qisPCv0lLRAdZOKAAPzIxBgW6Rgos3_Ly3pcD0g85B&__tn__ =%2CO%2CP-R (last visited Dec. 9, 2022).

653.    Defendants recruited hundreds of foreign workers under the TN visa program under this scheme to advertise false job openings, make false job offers, submit false TN visa Support letters, induce the foreign workers to come to the United States for non-existent jobs, and require the foreign workers to work in manual labor positions for lower pay, discriminatory pay, and pay that violated the FLSA.    JKL's website currently claims that it employs more than 150 team members.

654.    The TN visa is tied to the associated employer for the duration of the TN visa period, unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers. 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker). Thus, the continued employment of the TN visa holders by Hyundai, Kia, and JKL threatens future fraud against the U.S. Government when these visas are renewed at the end of the three-year visa period.

### *Racketeering Activity through Numerous Predicate Acts of Fraud*

655.    As part of a scheme or artifice to defraud, Defendants caused to be transmitted by mail and/or wires the job announcements used to recruit candidates like Plaintiffs for employment with Hyundai and/or Kia.

656.    The job announcements contained material misrepresentations upon

120

which Plaintiff Perez and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343.

657.   As part of a scheme or artifice to defraud, Defendants caused to be transmitted by mail and/or wires the offer letters which offered employment at Hyundai or Kia to Plaintiff Perez and others.

658.   The offer letter contained material misrepresentations upon which Plaintiff Perez and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343.

659.   As part of a scheme or artifice to defraud, Defendants caused to be transmitted by mail and/or wires statements of fact to the U.S. Government regarding the jobs to be performed by Plaintiff Perez and others.

660.   Defendants made material misrepresentations in the statements of fact submitted to the U.S. Government, and the U.S. Government relied on those statements in issuing TN visas to Plaintiff Perez and others, constituting violations of 18 U.S.C. §1341 and/or §1343 and §1546.

661.   As part of a scheme or artifice to defraud, Defendants TESS and JKL used materially false or fraudulent representations or promises regarding employment offered to Plaintiff Perez and others knowingly and with the intent to defraud in violation of 18 U.S.C. § 1351.

662.   As part of a scheme or artifice to defraud, Defendants used false attestations to secure work authorization for Plaintiffs and others and/or knowingly subscribed as true false statements concerning the jobs to be performed by Plaintiffs and others, which were material facts in an application, affidavit, or other document submitted for use in immigration proceedings to obtain a visa, constituting a violation of 18 U.S.C. § 1546.

663.   The Enterprise II members each knowingly and with the intent to defraud recruited, solicited, and hired Plaintiffs and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

664.   Hyundai and Kia agreed with TESS and JKL that, knowingly and with the intent to defraud they would recruit, solicit, and hire Plaintiff Perez and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

665.   Defendants used false attestations and provided fraudulent Visa Support Letters to the United States government for purposes of committing visa fraud in violation of 18 U.S.C. § 1546; *see e.g., U.S. v. Wu*, 20-10273, 2022 WL 4461376, at *3 (9th Cir. Sept. 26, 2022).

### *Plaintiffs' Pecuniary Injuries Directly and Proximately Caused by the Pattern of Racketeering Activity*

666.   Defendants knowingly and through fraudulent conduct induced Plaintiff Perez and other foreign workers to unknowingly pay for and apply for a fraudulent TN visa, to travel to the United States for a job that did not exist, and to accept employment at terms that were less than promised.

667.   Hyundai and JKL did not pay the Hyundai Claimants and other foreign workers the salary promised in the job offers and Support Letter provided to the consulate.

668.   Kia and JKL did not pay the Kia Claimants and other foreign workers the salary promised in the job offers and Support Letter provided to the consulate.

669.   Plaintiff Perez and other TN visa foreign workers suffered pecuniary losses that were directly and proximately caused by the fraudulent job posting for a position with Hyundai or Kia, the application and related information provided to them by Defendants in Enterprise II, the offer letter provided to them by Defendants TESS and JKL, and the Support Letter provided to them and the U.S. Consulate by Defendants in Enterprise II and the resulting TN visas issued to them, including but not limited to:

        a.   Travel costs to and from the U.S. consulate for the mandated TN visa interview;

123

b. U.S. Government visa processing fees of $160 per visa;

c. Unreimbursed expenses for travel to the U.S. to work for Hyundai and/or Kia and return travel to Mexico;

d. Costs to purchase essential furniture and household goods upon arrival at housing provided by Defendants; and

e. Lost wages in the form of the difference between the wages promised and the lower wages actually paid.

670.   These pecuniary losses and others would not have been suffered but for the material misrepresentations made to Plaintiff Perez and others as part of the scheme to defraud them and the U.S. Government to secure recruit Plaintiff Perez and others for jobs that did not exist.

## Enterprise III

671.   Defendants Hyundai, Kia, JKL, TESS, SPJ, and Allswell were an enterprise ("RICO Enterprise III") within the meaning of RICO in that they were associated in fact although not a legal entity. 18 U.S.C. 1961(4).

### *Association-in-Fact*

672.   RICO Enterprise III was an ongoing organization with a framework, either formal or information, for carrying out its common purpose.

673.   The association comprising RICO Enterprise III began as early as

November 2020 and has resulted in fraud upon Plaintiffs and dozens of other foreign workers recruited from Mexico to work for Defendants.

674.   RICO Enterprise III members associated with each other for the common purpose of recruiting Mexican engineers for and employing Mexican engineers at the Hyundai/Kia plant and assembly production line.

675.   Hyundai and Kia agreed with JKL, TESS, SPJ, and Allswell that JKL, TESS, SPJ, and Allswell would recruit and employ foreign workers to work as laborers on Hyundai's and Kia's production line.

676.   SPJ and TESS knowingly agreed with Hyundai, Kia, JKL, and Allswell to post fraudulent announcements for employment at the Hyundai/Kia plant as engineers or in other positions with education and skill requirements necessary to make foreign workers qualified for TN visas.

677.   In furtherance of the scheme, Hyundai and Kia provided detailed information relating to Hyundai's and Kia's plant operations to use during recruitment and to include in the TN visa support letters.

678.   Hyundai and Kia agreed to this scheme as evidenced by its hiring the Hyundai Claimants and the Kia Claimants, respectively, once they secured a TN visa and jointly employing them with Allswell or JKL. The foregoing activities constitute mail and/or wire fraud, violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343, and

damaged Plaintiffs and similarly situated employees.

679.   Hyundai's and Kia's agreement to this scheme also is evidenced by their knowledge of the TN visa requirements, knowledge that foreign workers must have a visa and work authorization, and their review of TN visa documents with full knowledge that the foreign workers were not performing jobs that qualified for the TN visa.

680.   Defendants agreed to make false representations to Plaintiffs, among many other similarly situated Mexican workers, that the jobs available at Hyundai and Kia required the education and skill that would make them eligible for TN visas and entice them to apply, while knowing that these jobs did not exist and that Plaintiffs and others would be working manual labor production assembly line jobs. Indeed, Hyundai and Kia allowed JKL and Allswell employees to work at the Hyundai/Kia plant, jointly trained and supervised the Hyundai Claimants and the Kia Claimants, respectively, during their employment, and provided Plaintiffs (except for Plaintiff Perez) and all Allswell employees identification badges to identify them and allow them access to the Hyundai/Kia plant.

681.   TESS, JKL, SPJ, and Allswell, acting as recruiters in consort with Hyundai and Kia, made these misrepresentations and took overt acts of collecting information, causing the mail/wires to be used in transmitting false and fraudulent

statements to Plaintiffs and others, facilitating consular interviews for Plaintiffs, preparing Plaintiffs for their consular interviews (including preparation of the types of questions they would be asked, and the answers to give), and providing other information to Hyundai and Kia.

682.   Acting on the basis of fraudulent misrepresentations made by TESS, JKL, Allswell, and SPJ, and with the plan and intention of using the same to defraud the U.S. Government in connection with TN visa applications, Plaintiffs and others were offered jobs at Hyundai or Kia as outlined in the Support Letters signed by Allswell or JKL.

683.   Yet Defendants knew that TN visas would not and could not be granted for workers who lacked the required education or professional experience to perform the manual labor positions that Hyundai and Kia wanted filled.

684.   Knowing that TN visas would be granted only for professional foreign workers for professional-level job positions, all of the Defendants agreed that TESS, JKL, SPJ, and Allswell (1) would recruit high skilled Mexican and Hispanic engineers and technicians for Hyundai and Kia who satisfied the TN visa requirements; and (2) would misrepresent the production line labor positions (which did not qualify for TN visas) as professional-level engineering and technician job positions (which did qualify for TN visas).

127

685.   The plan continued with TESS and SPJ vetting the Plaintiffs and other candidates, obtaining their resumes, technical or bachelor's degrees, and checking their educational background and engineering and/or technician skills before offering jobs to each of them.

686.   The plan continued with TESS and SPJ, during the interview, confirming that Plaintiffs and other foreign workers were in fact highly skilled and highly educated, and concealing the nature of the job available for Plaintiffs and other foreign workers.

687.   The plan continued with TESS and SPJ providing fraudulent job offers to Plaintiffs and other foreign workers on behalf of JKL or Allswell and Hyundai and/or Kia that mispresented the job positions, duties, and pay so that the job positions met the requirements for TN visas and so that Plaintiffs and other foreign workers would accept the job positions and apply for TN visas, to their detriment.

688.   The plan continued with JKL and Allswell preparing, and TESS and SPJ providing, fraudulent TN visa Support Letters to Plaintiffs and other foreign workers upon the acceptance of the job offers.

689.   The plan continued with SPJ providing the Plaintiffs they recruited, and other workers, directions on how to prepare for and answer questions during their consular interviews so that they could obtain TN visas and with TESS providing

Plaintiff Perez and other workers with similar directions.

690.   At the time that TESS, JKL, SPJ and Allswell provided the fraudulent TN visa Support Letters to Plaintiffs and other foreign workers, offering each Plaintiff an engineer or technician position, all the Defendants knew that the letters included false descriptions of the job positions available for Plaintiffs and other workers, false descriptions of the pay to Plaintiffs and other foreign workers, and other false information.

691.   The fraudulent TN visa Support Letters were directed to the United States consulate and were part of Defendants' scheme, through the RICO Enterprise to commit visa fraud, mail and wire fraud, and fraud in foreign labor contracting.

### *Participation in the Operation and Management of the Enterprise's Affairs*

692.   Hyundai, Kia, and Allswell agreed that SPJ would post job announcements for positions of employment at the Hyundai or Kia plant which would, by reason of the education, experience, and skill required, qualify the successful applicant to obtain a TN visa.

693.   Likewise, Hyundai, Kia, and JKL agreed that TESS would post job announcements for positions of employment at the Hyundai plant which would, by reason of the education, experience, and skill required, qualify the successful applicant to obtain a TN visa.

694.   TESS, JKL, Allswell, and SPJ developed a strategy to recruit foreign workers who may be qualified for the TN visa, including by identifying appropriate websites and other locations in which to post announcements for jobs at Hyundai and Kia, at the Hyundai/Kia plant, that would be seen and responded to by qualified Mexican nationals.

695.   TESS and SPJ then executed that strategy, communicating with Plaintiffs and other potential targets of the fraud scheme to screen them for employment with JKL, Allswell, Hyundai, and Kia, checking their educational background and engineering or technician qualifications, and preparing them for their consular interviews.

696.   TESS and SPJ accepted the directives of Hyundai, Kia, JKL, and Allswell and provided information concerning the positions at Hyundai and Kia to individuals who responded to the announcements they posted.

697.   TESS and SPJ made false statements and fraudulent misrepresentations to the candidates during their job interviews.

698.   SPJ, Allswell, TESS, or JKL decided which candidates to hire. Then, SPJ and TESS directed Allswell, JKL, Hyundai, or Kia to provide those candidates with job offers, which they did, for jobs that did not exist.

699.   Allswell and JKL prepared Support Letters for hired candidates, with

the approval of Hyundai and Kia for employment at their plants.

700.   SPJ and TESS provided those Support Letters to Plaintiffs. The Support Letters offered Plaintiffs a job at or inside Hyundai or Kia, except for Arellano, who was offered a job at another auto parts manufacturer in his Support Letter but was ultimately placed to work at Hyundai upon his arrival in the United States.

701.   TESS, JKL, SPJ, and Allswell provided the fraudulent Support Letters to the U.S. Consulate on behalf their respective companies, Hyundai, Kia, and the hired candidates.

### *Pattern of Continuous Coordinated Conduct*

702.   As shown by the fact that Plaintiff Zapata viewed a LinkedIn advertisement posted by SPJ Connect for an engineering job as early as November 2020 and was subsequently placed at a TN-visa qualifying jobs at Hyundai by Allswell and SPJ, the pattern of continuous coordinated conduct by the RICO Enterprise began at least as early as November 2020.

703.   Defendants continued to recruit Mexican nationals to work at Hyundai and Kia with TN visas at least until the time of the filing of the original Complaint.

704.   SPJ and TESS continue to post on Facebook and other social media in an effort to recruit TN visa applicants for positions SPJ and TESS claims are engineering jobs.

705.   For example, on July 15, 2022, SPJ posted pictures on Facebook at the Hyundai/Kia plant where some Plaintiffs worked and wrote: "The SPJ Connect team visiting one of the most recognized companies in the automotive industry. Looking for new opportunities."

706.   As another example, on November 15, 2022, TESS posted a job fair announcement on Facebook claiming that it was hiring "Mexican professionals" for work with a "TN visa" and had vacancies for "engineers and technicians."[16]

707.   Hyundai, Kia, JKL, and Allswell continue their illegal scheme by continuing to employ workers under the TN visa program that are highly skilled but employed in manual labor low-skilled positions and at lower pay than the American workers.   All Defendants continue to participate in and profit from this illegal scheme.

708.   Defendants recruited hundreds of foreign workers under the TN visa program under this scheme to advertise false job openings, make false job offers, submit false TN visa Support letters, induce the foreign workers to come to the

---

[16] *See* https://www.facebook.com/TESS.LLC.USA/posts/pfbid037 euD2LiyVRLgGG3pF5Rxhj9JjR1wJppevpxuXucRnhGv2LfwXwdTu4ZZsmuauY xCl?__cft__[0]=AZWlpL0nlyYw2_jpQX3-4G_XgevQyxL56IbwHMUIJVTv_4H q68aJgq_3gfCDGDgUHKDmh9wljoclq6YM6WJDNpOuVh0UZvarG_Dz1u96B3 iCFZKAIKJQMbMHyXFfr_fvDc-U2rpmXKqsaXt5OAABw09x9usWH qJ5pMyiy7l_P49nK4qisPCv0lLRAdZOKAAPzIxBgW6Rgos3_Ly3pcD0g85B&_ _tn__=%2CO%2CP-R (last visited Dec. 9, 2022).

United States for non-existent jobs, and require the foreign workers to work in manual labor positions for lower pay, discriminatory pay, and pay that violated the FLSA.

709.   The TN visa is tied to the associated employer for the duration of the TN visa period, unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers. 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker). Thus, the continued employment of the TN visa holders by Hyundai, Kia, JKL, and Allswell threatens future fraud against the U.S. Government when these visas are renewed at the end of the three-year visa period.

### *Racketeering Activity through Numerous Predicate Acts of Fraud*

710.   As part of a scheme or artifice to defraud, Defendants caused to be transmitted by mail and/or wires the job announcements used to recruit candidates like Plaintiffs for employment with Hyundai and/or Kia.

711.   The job announcements contained material misrepresentations upon which Plaintiffs and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343.

712.   As part of a scheme or artifice to defraud, Defendants caused to be transmitted by mail and/or wires the offer letters which offered employment with or

133

inside Hyundai or Kia to Plaintiffs and others.

713.    The offer letter contained material misrepresentations upon which Plaintiffs and others relied to their detriment, constituting violations of constituting a violation of 18 U.S.C. § 1341 and/or § 1343.

714.    As part of a scheme or artifice to defraud, Defendants caused to be transmitted by mail and/or wires statements of fact to the U.S. Government regarding the jobs to be performed by Plaintiffs and others.

715.    Defendants made material misrepresentations in the statements of fact submitted to the U.S. Government, and the U.S. Government relied on those statements in issuing TN visas to Plaintiffs and others, constituting violations of 18 U.S.C. § 1341 and/or § 1343 and §1546.

716.    As part of a scheme or artifice to defraud, Defendants TESS, JKL, SPJ, and Allswell used materially false or fraudulent representations or promises regarding employment offered to Plaintiffs and others knowingly and with the intent to defraud, and also caused others to recruit or hire them, in violation of 18 U.S.C. § 1351.

717.    As part of a scheme or artifice to defraud, Defendants used false attestations to secure work authorization for Plaintiffs and others and/or knowingly subscribed as true false statements concerning the jobs to be performed by Plaintiffs

and others, which were material facts in an application, affidavit, or other document submitted for use in immigration proceedings to obtain a visa, constituting a violation of 18 U.S.C. § 1546.

718.  Defendants each knowingly and with the intent to defraud recruited, solicited, and hired Plaintiffs and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

719.  Hyundai and Kia caused TESS, JKL, Allswell, and SPJ to knowingly and with the intent to defraud recruit, solicit, and hire Plaintiffs and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

720.  Defendants used false attestations and provided fraudulent Visa Support Letters to the United States government for purposes of committing visa fraud in violation of 18 U.S.C. § 1546; *see e.g., U.S. v. Wu*, 20-10273, 2022 WL 4461376, at *3 (9th Cir. Sept. 26, 2022).

### *Plaintiffs' Pecuniary Injuries Directly and Proximately Caused by the Pattern of Racketeering Activity*

721.  Defendants knowingly and through fraudulent conduct induced Plaintiffs and other foreign workers to unknowingly pay for and apply for a

fraudulent TN visa, to travel to the United States for a job that did not exist, and to accept employment at terms that were less than promised.

722.   Hyundai, JKL, and Allswell did not pay the Hyundai Claimants and other foreign workers the salary promised in the job offers and Support Letter provided to the consulate.

723.   Kia, JKL, and Allswell did not pay the Kia Claimants and other foreign workers the salary promised in the job offers and Support Letter provided to the consulate.

724.   Plaintiffs and other TN visa foreign workers suffered pecuniary losses that were directly and proximately caused by the fraudulent job posting for a position with Hyundai or Kia, the application and related information provided to them and the U.S. government by Defendants, the offer letter provided to them by Defendant SPJ and Allswell or TESS and JKL, and the Support Letter provided to them and the U.S. Consulate by Defendants and the resulting TN visas issued to them, including but not limited to:

    a.    Travel costs to and from the U.S. consulate for the mandated TN visa interview;

    b.    U.S. Government visa processing fees of $160 per visa;

c.    Unreimbursed expenses for travel to the U.S. to work for Hyundai and/or Kia and return travel to Mexico;

d.    Costs to purchase essential furniture and household goods upon arrival at housing provided by Defendants; and

e.    Lost wages in the form of the difference between the wages promised and the lower wages actually paid.

725.   These pecuniary losses and others would not have been suffered but for the material misrepresentations made to Plaintiffs and others as part of the scheme to defraud them and the U.S. Government to secure recruit Plaintiffs and others for jobs that did not exist.

## The RICO Conspiracy

726.   Plaintiffs plead the existence of the RICO Conspiracies with respect to RICO Enterprise I and RICO Enterprise II.

727.   Defendants JKL and TESS conspired with Defendants Hyundai, Kia, Allswell, and SPJ, acting through RICO Enterprise I, by adopting the goal of furthering and participating in the objectives of RICO Enterprise I to engage in a fraudulent scheme.

728.   Defendants Hyundai, Kia, Allswell, and SPJ agreed that SPJ would post multiple fraudulent job announcements using wires; that Allswell and SPJ would

send multiple fraudulent job offers to multiple different candidates; and that Allswell and SPJ would send fraudulent Support Letters to Plaintiffs and others and the U.S. Government, which constitute multiple predicate acts of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and/or § 1343, labor contracting fraud in violation of 18 U.S.C. § 1351, and misuse of visas in violation of 18 U.S.C. § 1546.

729.    At the same time Defendants Hyundai, Kia, Allswell, and SPJ engaged in this pattern of racketeering activity through RICO Enterprise I, Defendants Hyundai and Kia (a) retained the services of Defendants TESS and JKL to engage in the same scheme to defraud Mexican engineers and the U.S. government for the same common purpose, and (b) TESS and JKL took affirmative steps, including coordinating communications with Mexican engineers and the U.S. government, knowingly and in furtherance of this fraudulent scheme.

730.    Defendant Allswell, and SPJ conspired with Defendants Hyundai, Kia, TESS, and JKL, acting through RICO Enterprise II, by adopting the goal of furthering and participating in the objectives of RICO Enterprise II to engage in a fraudulent scheme.

731.    Defendants Hyundai, Kia TESS, and JKL agreed that TESS would post multiple fraudulent job announcements using wires; that TESS and JKL would send multiple fraudulent job offers to multiple different candidates; and that TESS and

138

JKL would send fraudulent Support Letters to Plaintiffs and others and the U.S. Government, which constitute multiple predicate acts of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and/or § 1343, labor contracting fraud in violation of 18 U.S.C. § 1351, and misuse of visas in violation of 18 U.S.C. § 1546.

732.   At the same time Defendants Hyundai, Kia TESS, and JKL engaged in this pattern of racketeering activity through RICO Enterprise II, Defendants Hyundai and Kia (a) retained the services of Defendants Allswell and SPJ to engage in the same scheme to defraud Mexican engineers and the U.S. government for the same common purpose, and (b) Allswell and SPJ took affirmative steps, including coordinating communications with Mexican engineers and the U.S. government, knowingly and in furtherance of this fraudulent scheme.

## CLASS ACTION ALLEGATIONS

733.   Plaintiffs bring their federal and Georgia RICO claims and their contract claims on behalf of themselves and a class of persons ("the Recruitment Class") consisting of:

> All individuals who, between August 11, 2018 and the present, (1) were recruited by TESS, JKL, SPJ, or Allswell, (2) were employed at the Hyundai/Kia plant, (3) received wages from Allswell or JKL; and (4) were TN visa holders.

734.   The Hyundai Claimants bring their Title VII and Section 1981 claims on behalf of a subclass of persons ("the Hyundai Discrimination Subclass")

consisting of:

> All individuals who, between August 11, 2018 and the present, (1)
> were recruited by TESS, JKL, SPJ, or Allswell, (2) were employed
> at the Hyundai production facility, (3) received wages from
> Allswell or JKL; and (4) were TN visa holders.

735.    The Kia Claimants bring their Title VII and Section 1981claims on

behalf of a subclass of persons ("the Kia Discrimination Subclass") consisting of:

> All individuals who, between August 11, 2018 and the present, (1)
> were recruited by TESS, JKL, SPJ, or Allswell, (2) were employed
> at the Hyundai/Kia plant, (3) received wages from Allswell or JKL;
> and (4) were TN visa holders.

736.    Plaintiffs Arellano, Ramirez, Salazar, Zapata, and Olan bring their 26

U.S.C. § 7434 (false information returns) claims on behalf of a subclass of persons

("the Tax Fraud Subclass") consisting of:

> All individuals who, between August 11, 2018 and the present who
> (1) received wages from Allswell, and (2) for whom Allswell did not
> report the individuals' full and accurate wages to the IRS.

737.    Excluded from the Classes are the legal representatives, officers,

directors, assigns, and successors of Defendants; any individual who at any time

during the Class periods have had a controlling interest in any Defendant; and all

persons who submit timely and otherwise proper requests for exclusion from the

Classes.

### *Numerosity*

738.   There are over 200 individuals who are members of the Class and Subclasses based on the number of individuals with TN visas hired to work at Hyundai and/or Kia.

739.   The members of the Classes and Subclasses are sufficiently numerous that joinder of all members is impractical.

### *Existence and Predominance of Common Questions*

740.   Common questions of law and fact exist as to Plaintiffs and members of the Classes and Subclasses and predominate over questions affecting only individual Class and Subclass members.

741.   These common questions include:

a.   whether Defendants conspired to violate the RICO;

b.   whether Defendants, through a RICO Enterprise, committed a pattern of racketeering activity causing Plaintiff and other TN visa holders to suffer pecuniary losses;

c.   The nature and extent of class-wide injury and the measure of damages for those injuries;

d.   Whether Hyundai and Allswell or Hyundai and JKL unlawfully discriminated against the Hyundai Claimants and other members of the

141

putative Hyundai Discrimination Subclass by paying them less than, requiring them to work longer than, and/or subjecting them to harsher discipline than U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic workers.

e. Whether Hyundai and Allswell or Hyundai and JKL's actions were undertaken knowingly, willfully, intentionally, and without justification to deprive the Hyundai Claimants and other putative Hyundai Discrimination Subclass members of their rights, and/or whether Hyundai, JKL, and Allswell acted intentionally and with malice or reckless indifference to the federally protected rights of the Hyundai Claimants and other Hyundai Discrimination Subclass members;

f. Whether Kia and Allswell, and/or Kia and JKL unlawfully discriminated against the Kia Claimants and other members of the putative Kia Discrimination Subclass by paying them less than, requiring them to work longer than, and/or subjecting them to harsher discipline than U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic workers;

g.  Whether Kia, Allswell, and JKL's actions were undertaken knowingly, willfully, intentionally, and without justification to deprive the Kia Claimants and other putative Kia Discrimination Subclass members of their rights, and/or whether Kia, Allswell, and JKL acted intentionally and with malice or reckless indifference to the federally protected rights of the Kia Claimants and other Kia Discrimination Subclass members;

h.  The nature and extent of class-wide injury and the measure of damages for those injuries;

i.  Whether Defendants breached a contractual promise to Plaintiffs and others to provide employment with job duties requiring engineering and/or technical education, experience, and skill;

j.  Whether Defendant Allswell willfully filed fraudulent information returns with the IRS with respect to Plaintiffs Zapata, Arellano, Ramirez, Salazar, Olan, and other members of the putative Tax Fraud Subclass;

k.  The nature and extent of class-wide injury and the measure of damages for those injuries.

### _Typicality_

742.  Members of the Class and Subclasses have all been subject to the same

unlawful practices of Defendants, and their claims arise out of these same practices.

743.  Plaintiffs and Class and Subclass members have the same rights under applicable laws.

744.  Plaintiffs and the Class and respective Subclasses were recruited and employed under the same or similar circumstances giving rise to the same claims.

745.  Plaintiff and the Class members suffered similar types of pecuniary damages.

746.  The Hyundai Claimants' claims are typical of the claims of the Hyundai Discrimination Subclass because, among other things, the Hyundai Claimants (a) were TN visa holders; (b) are Hispanic Mexican nationals; and (c) were employees who worked for Hyundai and Allswell or Hyundai and JKL and suffered the same violations as the proposed Hyundai Discrimination Subclass members.

747.  The Kia Claimants' claims are typical of the claims of the Kia Discrimination Subclass because, among other things, the Kia Claimants (a) were TN visa holders; (b) are Hispanic Mexican nationals; and (c) were employees who worked for Kia and Allswell, or Kia and JKL, and suffered the same violations as the proposed Kia Discrimination Subclass members.

748.  Plaintiffs Zapata, Arellano, Ramirez, Salazar, and Olan's false information returns claims are typical of the claims of the Tax Fraud Subclass

144

because Defendant Allswell willfully filed the same fraudulent quarterly and annual information returns with the IRS underreporting Plaintiffs Zapata, Arellano, Ramirez, Salazar, Olan's and other putative Tax Fraud Subclass members' wages;

749.   Plaintiffs' interests are co-extensive with the interests of the Class and Subclass members; Plaintiffs have no interest adverse to the Class or Subclass members.

750.   Plaintiffs and the Class and Subclasses were offered and did accept the same terms and conditions of employment which Defendants are alleged to have breached.

### *Adequacy*

751.   Plaintiffs will fairly and adequately represent the interests of the Class and Subclass members. Their interests do not conflict with the interests of the members of the Class and Subclasses they seek to represent.

752.   Plaintiffs understand that, as Class representatives, they assume a responsibility to the Class and Subclasses to represent their interests fairly and adequately.

753.   Plaintiffs have retained counsel experienced in prosecuting class actions and in employment matters. There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

## *Superiority*

754.   A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

755.   The damages suffered by each individual Class and Subclass member may not be sufficient to justify the burden and expense, particularly in light of the transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.

756.   Further, it would be difficult for members of the Class and Subclasses to obtain individual redress effectively for the wrongs done to them. If individual actions were to be brought by each member of the Class and Subclasses, the result would be a multiplicity of actions, creating hardships for members of the Class and Subclasses, the Court, and Defendants.

757.   Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

758.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

759.   This case does not present individualized factual or legal issues which

would render a class action difficult.

760.   In the alternative, the Class and Subclasses may be certified because: (a)  the prosecution of separate actions by the individual members of the Class and Subclasses would create a risk of inconsistent or varying adjudication with respect to individual Class and Subclass members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class and Subclass members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class and Subclass members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final and injunctive relief with respect to the members of the Class and Subclasses as a whole.

## FLSA COLLECTIVE ACTION ALLEGATIONS

761.   The Hyundai Claimants and other similarly situated TN visa workers regularly worked at the Hyundai/Kia plant in excess of 40 hours per week ("overtime") for the duration of their employment.

762.   The Kia Claimants and other similarly situated TN visa workers regularly worked at the Hyundai/Kia plant in excess of 40 hours per week

("overtime") for the duration of their employment.

763.   During Plaintiffs' and other similarly situated TN visa holders' employment, JKL and Allswell provided them with housing.

764.   As set forth in the offer letters and support letters provided to Plaintiffs, housing accommodations and transportation assistance were regarded as part of Plaintiffs' and other similarly situated workers' compensation.

765.   When calculating overtime wages, Hyundai, Kia, JKL, Allswell, and Lee (the "FLSA Defendants") did not include in the regular rate of pay the reasonable cost to Defendants or the fair value of the housing or transportation assistance. 29 C.F.R. § 778.116.

766.   Additionally, as a condition of obtaining their employment with JKL, Allswell, Hyundai, and/or Kia, Plaintiffs and other similarly situated TN visa holders were required to incur the cost of their TN visas and inbound and outbound travel expenses, which primarily benefitted Defendants, and were not reimbursed in Plaintiffs' first and/or final workweeks, effectively reducing Plaintiffs' wages below their required overtime rates of pay.

767.   Therefore, Hyundai and JKL or Hyundai, Allswell, and Lee did not pay the Hyundai Claimants and other similarly situated TN visa holders, and Kia and JKL or Kia, Allswell, and Lee did not pay the Kia Claimants and other similarly

situated TN visa holders, overtime wages at a rate of one-and-one-half their regular rate of pay, as required by the FLSA. 29 U.S.C. § 207(a).

768.   TN visa holders employed with Hyundai and/or Kia through Defendant JKL were subjected to off-the-clock working hours, and "sign-up bonus deductions" or other, similar deductions, that reduced their effective hourly pay below both the required overtime rate and the federal minimum wage, 29 U.S.C. §§ 206, 207.

769.   The actions and omissions alleged above were willful in that the FLSA Defendants were aware of their obligations regarding overtime wages, showed reckless disregard for whether their conduct violated the FLSA, or acted without a reasonable basis to believe their actions were in compliance with the FLSA.

770.   Plaintiffs and other TN visa holders were subject to the same policies and practices of Allswell or JKL and Hyundai and/or Kia.

771.   Common proof applicable to Plaintiffs and the other TN visa holders will show that the FLSA Defendants failed to properly pay required overtime and/or minimum wages.

772.   Plaintiffs are currently unaware of the identities of all the employees who would be members of the FLSA opt-in class, but this information is readily ascertainable from the Allswell, JKL, Hyundai, and Kia's records.

773.   The FLSA Defendants therefore should be required to provide

Plaintiffs with a list—including last known addresses, telephone numbers, and email addresses if known—of all individuals who were TN visa holders employed at the Hyundai/Kia plant between August 11, 2018 and the present.

774.  For purposes of the FLSA, Plaintiffs bring this suit on behalf of themselves and the following two classes of similarly situated workers:

  a.  All current and former TN visa employees who worked under Allswell at Hyundai and/or Kia within the three-year period before the filing of this Complaint, who elect to opt-in to this action under the FLSA, 29 U.S.C. § 216(b), and were:

  - paid a regular rate that did not include the fair value of housing and transportation assistance provided;

  - not reimbursed in full for inbound or outbound visa and travel costs; or

  - otherwise deprived of minimum or overtime wages; and

  b.  All current and former TN visa employees who worked under JKL at Hyundai and/or Kia within the three-year period before the filing of this Complaint, who elect to opt-in to this action under the FLSA, 29 U.S.C. § 216(b), and were:

- paid a regular rate that did not include the fair value of housing and transportation assistance provided;

- not reimbursed in full for inbound or outbound visa and travel costs;

- required to work hours "off the clock";

- charged "Bonus Advance Deductions" or other deductions unrelated to amounts actually owed; or

- otherwise deprived of minimum or overtime wages.

**<u>COUNT I</u>**
**Racketeer Influenced and Corrupt Organizations Act,**
**18 U.S.C. § 1961-68**
**Class Claim**
***Against Defendants Hyundai, Kia, Allswell, SPJ, JKL, and Tess***

775. Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

776. This Count sets forth claims by Plaintiffs and other members of the Recruitment Class against all Defendants for damages resulting from Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-68.

777. Each Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

778.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

779.   The RICO Enterprises I, II, and III, as defined above, are each an association-in-fact enterprise with the common purpose of securing cheap manual labor to work at Hyundai/Kia plant in violation of the immigration laws, and to profit from such labor.

780.   The RICO Enterprises engaged in and affected interstate commerce

781.   The RICO Enterprises function as continuing units.

782.   The Defendants conducted or participated—and/or conspired to do so—in the affairs of the RICO Enterprises, through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d), related by their common purpose.

783.   Each of the Defendants also participated in the operation or management of the respective enterprise itself, directing the activity of the enterprise.

784.   Specifically, the Defendants conducted or participated and/or conspired to do so in the affairs of the respective RICO Enterprises by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

   a.  Mail fraud in violation of 18 U.S.C. § 1341;

b.  Wire fraud in violation of 18 U.S.C. § 1343;

c.  Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351; and

d.  Visa Fraud in violation of 18 U.S.C. § 1546.

### *Predicate Acts*

### Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

785.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, made—and/or conspired to make—material misrepresentations to the U.S. Government and to TN visa applicants regarding the nature of Plaintiffs' and other Recruitment Class members' work, the hours they would work, and the wages they would receive.

786.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, used and/or conspired to use the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to further these fraudulent schemes.

787.   These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

### Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351

788.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, knowingly and with intent to defraud, recruited, solicited, and

hired Plaintiffs and other Recruitment Class members outside the United States—and/or conspired to do so—for the purpose of employment in the United States by means of materially false or fraudulent pretenses, representations, or promises regarding the nature of Plaintiffs' and other Recruitment Class members' work, the hours they would work, and the wages they would receive.

789.   These willful, knowing, and intentional acts constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

<u>Fraud and Misuse of Visas: 18 U.S.C. § 1351</u>

790.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, knowingly used, attempted to use, possessed, and received - and/or conspired to do so - TN visa application documents seeking authorization for Plaintiffs and other Recruitment Class members to work in the U.S. and TN visas issued to those individuals, which were procured by means of false claims or statements, and/or otherwise procured by fraud or unlawfully obtained, and Defendants also knowingly presented false statements in applications, affidavits, and/or other documents in support of such visa applications, knowingly causing the U.S. Government to issue TN visas to Plaintiffs and others which would not have been issued but for the false statements concerning the work to be performed by Plaintiffs and others at Hyundai and/or Kia.

791.   These willful, knowing, and intentional acts constitute fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1351.

### *Pattern of Related Racketeering Acts*

792.   Defendants engaged in the racketeering activity described in this claim repeatedly from 2020 through the present.

793.   The pattern affected hundreds of individuals, accomplishing its fraudulent purposes on the U.S. Government and foreign workers who came to work for Defendants Allswell and/or JKL and Hyundai and/or Kia on dozens of occasions during the period of the pattern of racketeering acts.

794.   Defendants, through the RICO Enterprises, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

795.   Defendants' racketeering acts have or had similar purposes: to profit from the fraud Defendants committed in the contracting, hiring, and employment of Plaintiffs and other Recruitment Class members.

796.   Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiffs and other Recruitment Class members, including underpayment of wages and lost employment opportunities.

797.   As set forth in the preceding paragraphs, the racketeering acts have or had similar participants: the Defendants and their agents.

155

798.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, directed their racketeering activities at similar individuals and entities: Plaintiffs and other Recruitment Class members, and federal government agencies.

799.   The Defendants' acts have or had similar methods of commission, such as common recruitment tactics and use of similar employment practices and policies with respect to Plaintiffs and other Recruitment Class members.

### *Conspiracy*

800.   As set forth in paragraphs 726 through 732, *supra*, Defendants conspired to violate the RICO, by agreeing to participate in the objectives of the Enterprises to engage in the pattern of racketeering activity.

### *Injury and Remedies*

801.   As a direct and proximate result of the Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs and Recruitment Class members have suffered injuries to their property, including but not limited to visa processing fees, unreimbursed travel expenses, incidental relocation expenses, wage underpayments, lost employment opportunities, and/or other pecuniary losses.

802.   Plaintiffs and other Recruitment Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

    a.  compensation for their injuries to their property;

    b.  trebling of the damages set forth in subparagraph (a), *supra*; and

    c.  attorneys' and experts' fees and costs associated with this action, as authorized by 18 U.S.C. § 1964(c).

803.   Plaintiffs are entitled to recover their reasonable attorney's fees and costs of litigation.

**COUNT II**
**Georgia Racketeer Influenced And Corrupt Organizations Act,**
**Ga. Code. Ann. § 16-14-1 *et seq.***
**Class Claim**
***Against Defendants Hyundai, Kia, Allswell, SPJ, JKL, and Tess***

804.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

805.   This Count sets forth Plaintiffs' and Recruitment Class members' claims for damages against all Defendants caused by all Defendants' violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO").

806.   Each Plaintiff is an aggrieved person with standing to sue within the meaning of Georgia RICO, O.C.G.A. § 16-14-6(b).

807.   Each Plaintiff is a person who was injured by reason of violations of O.C.G.A. § 16-14-4, and therefore, Plaintiffs have standing to sue pursuant to Georgia RICO, O.C.G.A. § 16-14-6(c).

808.   Defendants are associated in fact although not a legal entity, and therefore are an enterprise, within the meaning of O.C.G.A. § 16-14-3(3).

809.   Defendants were active members of RICO Enterprises I, II, and III, as defined above, with the common purpose of securing cheap manual labor to work at the Hyundai/Kia plant in violation of the immigration law, and to profit from such labor. O.C.G.A. § 16-14-3(6).

810.   The RICO Enterprises function as continuing units.

811.   The Defendants were employed by or associated with the RICO Enterprises and conducted or participated in the RICO Enterprises – and/or conspired to do so – through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b) and 16-14-4(c), related by their common purpose of securing cheap manual labor to work at the Hyundai/Kia plant, and to profit from such labor.

812.   Specifically, the predicate acts of racketeering activity by which the Defendants committed the Georgia RICO violations set forth in the preceding paragraphs, are the following:

a.   Mail fraud in violation of 18 U.S.C. § 1341;

b.   Wire fraud in violation of 18 U.S.C. § 1343;

c.   Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351;

d.   Visa Fraud in violation of 18 U.S.C. § 1546; and

e.   False Statements and Writings in violation of O.C.G.A. § 16-10-20.

813.   The Defendants used proceeds derived from the racketeering activity – and/or conspired to do so – to acquire and maintain interest in money.

### *Predicate Acts*

### Conduct Defined as "Racketeering"

814.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises I, II, and III, committed – and/or conspired to commit through Enterprises I and II – mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; fraud in foreign labor contracting, in violation of 18 U.S.C. §§ 1351; and visa fraud in violation of 18 U.S.C. § 1546.

### False Statements and Writings in violation of O.C.G.A. § 16-10-20

815.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, did or conspired to knowingly and willfully falsify material facts and make false, fictitious, or fraudulent statements or representations regarding the wages Plaintiff would receive and the work Plaintiff would perform, as detailed in the Support Letters provided to Plaintiffs.

816.   These knowing and willful acts constituted false statements in violation of O.C.G.A. § 16-10-20.

*Pattern of Related Racketeering Acts*

817.   The Defendants engaged in the racketeering activity described in this lawsuit repeatedly, starting as early as November 2020, and continuing through the present.

818.   The Defendants, through the RICO Enterprises, and/or conspiring with the RICO Enterprises, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

819.   The Defendants' racketeering acts have had similar purposes: to profit from fraudulent recruitment of Plaintiffs and other foreign workers, and profit from cheap labor in violation of immigration law.

820.   Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiffs, as outlined below.

821.   As set forth herein, each of the Defendants agreed to commit more than two predicate acts, including, but not limited to:

a. Hyundai and Kia directed TESS, JKL, SPJ, and Allswell to—and agreed that TESS, JKL, SPJ, and Allswell would—post of jobs offers for employment at Hyundai and Kia that contained fraudulent misrepresentations which Plaintiffs and others relied upon;

160

b. TESS, JKL, SPJ and Allswell agreed to post job offers for employment at Hyundai and/or Kia that contained fraudulent misrepresentations which Plaintiffs and others relied upon;

c. TESS and SPJ interviewed Plaintiffs and others using wires and made fraudulent misrepresentations to them for the purpose of enticing them to apply for employment at JKL, Allswell, Hyundai, and/or Kia which did not exist and was not eligible for a TN visa;

d. TESS, JKL, SPJ, and Allswell offered employment to Plaintiffs and others on the basis of fraudulent misrepresentations, and sent Plaintiffs and others offer letters containing fraudulent misrepresentations using mails and/or wires;

e. Hyundai and/or Kia agreed that TESS, JKL, SPJ, and Allswell would use the mail and/or wires to send the offer letters containing fraudulent misrepresentations to the Hyundai Claimants and/or the Kia Claimants, respectively;

f. JKL and Allswell prepared and submitted Support Letters falsely and fraudulently certifying the nature of the jobs being offered to Plaintiffs and others at Hyundai and/or Kia;

g.  Hyundai and Kia provided, and/or agreed to the provision of, the false information contained in the Support Letters for the purpose of defrauding Plaintiffs and the U.S. Government to secure cheap labor in violation of immigration law at the Hyundai/Kia plant after Plaintiffs obtained TN visas and began working for the companies;

h.  TESS, JKL, SPJ, and Allswell submitted the false and fraudulent Support Letters to the U.S. Government for the purpose of defrauding the U.S. Government and inducing it to issue TN visas to Plaintiffs and others for jobs that did not qualify for the TN visa program;

i.  Hyundai's and Kia's human resources departments had actual knowledge that Plaintiffs and others were permitted to work in the United States only pursuant to TN visas and knowingly hired them for positions that did not qualify for the TN visa program in violation of federal law;

j.  Hyundai and JKL, and Hyundai and Allswell were joint employers that knowingly hired (and continued to hire) the Hyundai Claimants to work in job positions that were contrary to their accepted job offers, contrary to the jobs identified in the TN visa Support Letters, and contrary to the requirements of the TN visa program;

k. Kia and JKL, and Kia and Allswell were joint employers that knowingly hired (and continued to hire) the Kia Claimants to work in job positions that were contrary to their accepted job offers, contrary to the jobs identified in the TN visa Support Letters, and contrary to the requirements of the TN visa program; and

l. Hyundai and Kia authorized, requested, participated in, and recklessly tolerated the fraudulent conduct of JKL, TESS, Allswell, and SPJ to secure cheap labor from Plaintiffs and Recruitment Class members in violation of the TN visa program.

### *Injury and Remedies*

822. As a direct and proximate result of the Defendants' willful, knowing, and intentional acts in violation of Georgia RICO set forth in this complaint, Plaintiffs and Recruitment Class members have suffered injuries to their property, including but not limited to visa processing fees, unreimbursed travel expenses, incidental relocation expenses, wage underpayments, lost employment opportunities, and/or other pecuniary losses, as well as emotional suffering.

823. The injuries flowed directly from the Georgia RICO predicate acts which were targeted at Plaintiffs and Recruitment Class members such that Plaintiffs and Recruitment Class members were the intended victims: Plaintiffs and

Recruitment Class members were the foreign workers that Defendants intentionally defrauded for purposes of securing cheap labor in violation of immigration law.

824.   Plaintiffs and other Recruitment Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

a.  compensation for their injuries to their property;

b.  punitive damages;

c.  trebling of the damages set forth in subparagraph (a) and (b), *supra*; and

d.  attorneys' and experts' fees and costs associated with this action, as authorized by O.C.G.A. § 16-14-6(c).

**COUNT III**
**Violation of Title VII**
**Class Claim**
***Against Defendants Hyundai, Kia, JKL, and Allswell***

825.   Plaintiffs reallege and incorporate all preceding paragraphs as if set forth fully herein.

826.   This Count sets forth claims for damages arising out of (a) the Hyundai Claimants' and other Hyundai Discrimination Subclass members' Title VII claims against joint employer Defendants Hyundai and JKL, joint employer Defendants Hyundai and Allswell, and  Kia Claimants' and other Kia Discrimination Subclass's Title VII claims against joint employers Defendants Kia and Allswell, and joint employers Kia and JKL.

827.  Plaintiffs and the Hyundai and Kia Subclass Members are members of protected classes in that they are non-white Hispanic or Latino, and are Mexican national origin.

828.  Plaintiffs and the Hyundai and Kia Subclass Members were subjected to disparate treatment discrimination on the basis of their race—non-white Hispanic or Latino—and/or their national origin—Mexican—including, but not limited to, being paid less for performing the same work as employees of Defendants who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic, and being forced to work overtime and more hours per week than those employees.

829.  The above-pled discriminatory conduct toward Plaintiffs and the Hyundai and Kia Subclass Members constitutes race and national origin discrimination against them in violation of Title VII, 42 U.S.C. § 2000e et seq.

830.  Defendants acted in bad faith, willfully and wantonly disregarded the rights of Plaintiffs and the Hyundai and Kia Subclass Members under Title VII, and acted in reckless disregard of their rights under Title VII.

831.  As a result of Defendants' discriminatory conduct, Plaintiffs and the Hyundai and Kia Subclass Members have suffered lost compensation and other economic benefits of employment, pain and suffering caused by emotional distress, inconvenience, humiliation, and other indignities.

832. Pursuant to Title VII, Plaintiffs and the Hyundai and Kia Subclass Members are entitled to damages, including back pay and lost benefits, promotion to a higher rate of pay, compensatory damages, punitive damages, attorney's fees and costs of litigation, and all other relief recoverable under Title VII.

### COUNT IV
### Violation of 42 U.S.C. § 1981
### Class Claim
### *Against Defendants Hyundai, Kia, JKL, and Allswell*

833. Plaintiffs and the Class Members reallege and incorporate all preceding paragraphs as if set forth fully herein.

834. This Count sets forth claims for damages arising out of (a) the Hyundai Claimants' and other Hyundai Discrimination Subclass members' 42 U.S.C. § 1981 claims against joint employer Defendants Hyundai and JKL, joint employer Defendants Hyundai and Allswell; and (b) the Kia Claimants' and other Kia Discrimination Subclass's 42 U.S.C. § 1981claims against joint employer Defendants Kia and Allswell and joint employer Defendants Kia and JKL.

835. Plaintiffs and the Hyundai and Kia Subclass Members were at all times relevant to this Complaint, parties to contracts, including contracts for the performance of work, in which Plaintiffs and the Hyundai and Kia Subclass Members were compensated by Defendants for work.

836.   Plaintiffs and the Hyundai and Kia Subclass Members performed their contractual obligations.

837.   Plaintiffs and the Hyundai and Kia Subclass Members are Hispanic or Latino and of Hispanic or Latino ancestry.

838.   Plaintiffs and the Hyundai and Kia Subclass Members were subjected to disparate treatment discrimination on the basis of their race, non-white Hispanic or Latino, and/or their national origin, Mexican, including, but not limited to, being paid less for performing the same work as white and American employees of Defendants and being forced to work overtime and more hours per week than those white and American employees.

839.   The above-pled discriminatory conduct toward Plaintiffs and the Hyundai and Kia Subclass Members constitutes unlawful race discrimination against them in violation of 42 U.S.C. § 1981.

840.   Defendants undertook their conduct intentionally and maliciously with respect to Plaintiffs and the Hyundai and Kia Subclass Members and their federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly with respect to the Plaintiffs and the Hyundai and Kia Subclass Members and their federally protected rights, entitling them to recover punitive damages against Defendants.

841.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs and the Hyundai and Kia Subclass Members have suffered lost compensation and other benefits of employment, pain and suffering in the form of emotional distress, inconvenience, humiliation, and other indignities.

842.   Plaintiffs and the Hyundai and Kia Subclass Members are entitled to damages, including back pay and lost benefits, promotion or a higher rate of pay, compensatory damages, punitive damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

<u>**COUNT V**</u>
**Fair Labor Standards Act Violations**
**Collective Action Claim**
***Against Defendants Hyundai, Kia, Allswell, Lee, and JKL***

843.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

844.   This count sets forth a claim by Plaintiffs, and by all similarly situated workers who opt into this action pursuant to 29 U.S.C. § 216(b), for damages resulting from Defendants Hyundai, Kia, JKL, Allswell, and Lee's violations of the FLSA.

845.   Plaintiffs and other TN visa holders regularly worked more than 40 hours in a single work week.

846.   Hyundai, Kia, JKL, Allswell, and Lee's failure to pay one-and-one-half times Plaintiffs' regular rate of pay for hours above 40 in a work week violated the overtime provisions of the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

847.   Additionally, Hyundai, Kia, and JKL's failure to pay at least $7.25 per hour violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), and its implementing regulations.

848.   Hyundai, Kia, JKL, Allswell, and Lee's violations of the FLSA were willful in that they were aware of their obligations regarding overtime and/or minimum wages, showed reckless disregard for whether their conduct violated the FLSA, or acted without a reasonable basis to believe their actions were in compliance with the FLSA.

849.   Plaintiffs and the other similarly situated TN visa holders are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendant's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

850.   Plaintiff and the other TN visa holders are also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

851.   Plaintiff and the other TN visa holders also seek, and are entitled to, the

attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

**COUNT VI**
**Breach of Contract under Georgia State Law**
**Class Claim**
***Against Defendant Hyundai, Kia, JKL, and Allswell***

852.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

853.   This count sets forth a claim by Plaintiffs and other Recruitment Class members for damages resulting from Defendants Hyundai, Kia, JKL, and Allswell's breaches of contract.

854.   Defendants Allswell and/or JKL and Hyundai and/or Kia made written offers of employment to Plaintiffs and the Recruitment Class Members which contained material terms of their employment, including that these jobs would be highly skilled engineer positions paying a certain rate of pay which would be eligible for the TN visa.

855.   Plaintiffs and the Recruitment Class Members accepted the material terms of employment offered by Defendants and forbore other opportunities of employment and undertook certain expenses in exchange for that employment as offered.

856.   Defendants did not provide employment to Plaintiffs and the Recruitment Class Members as offered, but rather, provided manual labor jobs on

its production line which were not eligible for TN visas.

857.   Defendants thus breached their contracts with Plaintiffs and the Recruitment Class Members.

858.   As a result, Plaintiffs and other Recruitment Class Members incurred incidental and consequential damages which they are entitled to recover at law, including but not limited to visa processing fees, unreimbursed travel expenses, relocation expenses, wage underpayments, and lost employment opportunities, and nominal damages.

859.   Also, Plaintiffs and other Recruitment Class Members are entitled to recover nominal damages for Defendants' breach of these contracts.

**<u>COUNT VII</u>**
**Filing False Information Returns, 26 U.S.C. § 7434**
**Class Claim**
***Against Defendant Allswell***

860.   Plaintiffs Zapata, Arellano, Ramirez, Salazar, and Olan reallege and incorporate by reference the foregoing allegations as if set forth fully here.

861.   This Count sets for claims by Plaintiffs Zapata, Arellano, Ramirez, Salazar, and Olan and other members of the Tax Fraud Subclass members against Defendant Allswell for damages resulting from Allswell's violations of 26 U.S.C. § 7434 (filing false information returns).

862.   As set forth above, Defendant Allswell provided the IRS false

171

information regarding Plaintiffs' and other Tax Fraud Subclass members' Social Security wages on IRS Form 941 and/or other information returns, in an attempt to defraud the IRS.

863.   Plaintiffs Zapata, Arellano, Ramirez, Salazar, Olan and other Tax Fraud Subclass members therefore are entitled, under 26 U.S.C. §7434(b), to recover the greater of either $5,000.00 for each false information return or damages these Plaintiffs and other Tax Fraud Subclass members sustained, the costs of this action, and reasonable attorney's fees.

864.   As required by 26 U.S.C. § 7434(d), Plaintiffs Zapata, Arellano, Ramirez, Salazar, and Olan will provide a copy of this Amended Complaint to the Internal Revenue Service.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all triable issues and seeks judgment as follows:

a.   assuming jurisdiction over this action;

b.   certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as counsel for the Class and Subclasses;

c.    declaring this action to be maintainable as a FLSA collective action pursuant to 29 U.S.C. § 216, allowing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible TN visa holders who choose to do so to opt into this action;

d.    declaring that Defendants violated federal and Georgia RICO;

e.    declaring Defendants Hyundai, Kia, JKL, and Allswell violated Section 1981 and Title VII;

f.    declaring Defendants Hyundai, Kia, JKL, Allswell, and Lee violated the FLSA;

g.    declaring Defendants breached contracts of employment with Plaintiffs and applicable Class members;

h.    permanently enjoining Defendants from further violations of the federal and Georgia RICO;

i.    permanently enjoining Defendants from further violations of Section 1981, Title VII, and the FLSA;

j.    permanently enjoining Defendant Allswell from further violations of 26 U.S.C. § 7434;

k.    granting judgment to Plaintiffs and other Recruitment Class members, and against all Defendants, on Plaintiffs' and other Recruitment Class

173

members' federal RICO claims and awarding them the trebled amount of their pecuniary losses;

l.    granting judgment to Plaintiffs and other Recruitment Class members, and against all Defendants, on Plaintiffs' and other Recruitment Class members' Georgia RICO claims and awarding them the trebled amount of their pecuniary losses and punitive damages;

m.    granting judgment to Plaintiffs and other Recruitment Class members, and against all Defendants, on Plaintiffs' and other Recruitment Class members' Georgia contract claims and awarding them compensatory and punitive damages;

n.    granting judgment to Plaintiffs and other Hyundai Discrimination and Kia Discrimination Subclass members, and against Defendants Hyundai, Kia, JKL, and Allswell, pursuant to Section 1981 and Title VII and awarding compensatory and punitive damages;

o.    granting judgment to Plaintiffs and other similarly situated TN visa holders who opt in pursuant to 29 U.S.C. § 216(b) on their FLSA claims, and against Defendants Lee, Allswell, Hyundai, JKL, and Kia, and awarding each of them their unpaid wages plus an equal amount in liquidated damages;

p.      granting judgment to Plaintiffs Zapata, Arellano, Ramirez, Salazar, Olan and other Tax Fraud Subclass members and against Defendant Allswell on their claims pursuant to 26 U.S.C. § 7434(d) and awarding them the greater of either $5,000.00 for each false information return;

q.      Awarding Plaintiffs and other Class members prejudgment and post-judgment interest as allowed by law;

r.      Awarding Plaintiffs and other Class members their costs and reasonable attorneys' fees; and

s.      Granting such further relief as the Court finds just.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of the Class and Subclasses, hereby demand a trial by jury as to all issues so triable.

Respectfully submitted this day: December 16, 2022.

> */s/ Rachel Berlin Benjamin*
> Rachel Berlin Benjamin
> Georgia Bar No. 707419
> Christopher B. Hall
> Georgia Bar No. 318380
> Brian J. Sutherland
> Georgia Bar No. 105408
> HALL & LAMPROS, LLP
> 300 Galleria Parkway, Suite 300
> Atlanta, GA 30339
> Telephone: (404) 876-8100
> Facsimile: (404) 876-3477

rachel@hallandlampros.com
brian@hallandlampros.com
chall@hallandlampros.com

*/s/ Daniel Werner*
`
Daniel Werner
Georgia Bar No. 422070
dan@decaturlegal.com
James Radford
Georgia Bar No. 108007
james@decaturlegal.com
RADFORD & KEEBAUGH, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0300

*/s/Benjamin R. Botts*
Benjamin R. Botts*
California Bar No. 274542
ben@cdmigrante.org
Kristin Greer Love**
New Mexico Bar No. 150902
kristin@cdmigrante.org
CENTRO DE LOS DERECHOS DEL
MIGRANTE, INC.
711 W 40th Street, Suite 412
Baltimore, MD 21211
Telephone: (855) 234-9699

*Admitted *Pro Hac Vice*
***Pro Hac Vice* application forthcoming

*Attorneys for Plaintiffs*

## CERTIFICATION OF COMPLIANCE

Pursuant to Local Rule 7.1D, counsel certifies that this filing was prepared using Times New Roman 14-point font.

*/s/ Rachel Berlin Benjamin*

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the above and foregoing was filed via the CM/ECF system on December 16, 2022, which will serve a copy on all counsel of record.

*/s/ Rachel Berlin Benjamin*